THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLENE EURE, Defendant-Appellant.

First District (2nd Division)   No. 84—1801

Opinion filed January 14, 1986.—Rehearing denied February 20, 1986.

Daniel E. Radakovich, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Donald G. Schweihs, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Following a jury trial, defendant-appellant Charlene Eure was convicted of the offenses of aggravated battery (based on the use of a deadly weapon in the commission of a battery) (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(b)(1)); aggravated battery (based on conduct causing great bodily harm) (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(a)); and armed violence (based on the latter aggravated battery) (Ill. Rev. Stat. 1981, ch. 38, par. 33A—1 *et seq.*). Judgment of conviction, however, was entered only as to the armed-violence count, as the trial court deemed the remaining charges to have merged with the armed violence. Defendant was thereafter sentenced to the minimum jail term of six years' incarceration. (Ill. Rev. Stat. 1981, ch. 38, pars. 33A—3(a), 1005—8—1(a)(3).) We affirm.

Defendant's appeal raises four issues: (1) whether the armed-violence conviction may stand in light of the Illinois Supreme Court's decisions in *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48, and *People v. Fernetti* (1984), 104 Ill. 2d 19, 470 N.E.2d 501; (2) whether the trial court's apparent failure to give the jury the definition instruction on the aggravated battery/use of a deadly weapon charge, in addition to the issues instruction on that offense, prejudiced the defendant; (3) whether the trial court abused its discretion when it refused defendant a midtrial continuance; and (4) whether the State's

closing argument was improper and prejudicial. Resolution of these issues requires a detailed account of the evidence adduced at trial.

The incident arose out of an altercation involving the defendant, Michelle Silas, and Silas' companion, Bolton Linton. The incident occurred at the New Look Lounge, a restaurant and tavern. Eure arrived at the lounge at approximately 1:40 a.m. on March 27, 1982. She seated herself at the bar, and ordered some food. Some time after 2 a.m. (the bar's closing time), Silas and Linton entered the bar and went to the disc jockey's table, where they spoke to the disc jockey. Silas indicated that the disc jockey was her cousin. After speaking briefly to the disc jockey, John Wilson, Silas received permission to order some drinks. She then went up to the bar area, where she encountered Eure.

At this point, Eure and Silas began arguing and verbally abusing each other. The evidence is conflicting as to who initiated the argument; the parties, however, agree that during the argument Linton came up to the bar, the drinks were readied, and Silas and Linton walked back to Wilson's station with the drinks. Apparently, the verbal abuse continued as the rivals separated.

Linton testified that as he passed by Eure, he noticed that she had pulled a gun and was pointing it at Silas' back. Linton told this to Silas, who looked back over her shoulder at Eure. Eure, meanwhile, continued to threaten Silas. According to Linton, the owner of the lounge, Marcus Williams, went over to Eure and spoke to her for a while, and then walked away. Eure then continued to threaten Silas and point the gun at her.

Silas' testimony comported with that of Linton; she testified, however, that several minutes passed before Linton told her that Eure had a gun pointed at her. She also stated that this conduct continued for another seven to eight minutes.

Linton indicated that this state of affairs continued for five minutes, at which point he told Silas he would push her out of the way and try to disarm the defendant. Linton then pushed Silas down, turned, and went for the gun. Linton stated that as he rushed Eure, she shot him in the left chest area. Silas testified first that Eure shot Linton when he went for the gun; on cross-examination, she stated that Eure fired before Linton pushed her down.

After he was shot, Linton reached Eure and grabbed both the gun and Eure's hand. Eure was still seated at the bar, and the two began wrestling over the gun. During this encounter, the gun discharged three more times, and Eure was pulled from her seat to the floor. Linton finally disarmed Eure, after which he held the gun aloft, and

turned it over to another patron of the lounge, who identified himself as a policeman. He told the officer he had been shot, and then he collapsed.

Both Linton and Silas claimed that the owner of the lounge and the officer refused to call an ambulance or direct Silas to the phone unless they agreed to tell the police that the incident occurred outside the lounge. Linton and Silas agreed to do so, and an ambulance and the police were called. Linton was then taken to the hospital, where he had surgery for the gunshot wound and was hospitalized for 14 days. The treating physician stated that the bullet passed within "maybe less than one millimeter" of the heart.

Eure's version of the events differed from both Silas' and Linton's. She testified that she and Silas began arguing, and the owner came out and calmed everyone down. Linton came over to Silas, and it appeared to Eure that Linton was trying to calm Silas and "hold her back" from Eure. Eure stated that Silas nonetheless continued to call and threaten her, and she became frightened.

Eure acknowledged that she had a loaded gun in her purse at that time. She stated that she owned a liquor store, and had the gun for protection. She kept it with her rather than leave it at the store, where she had been prior to going to the lounge that night.

Eure had her hand in her purse during the altercation. Linton turned and lunged at her, grabbing her arm. Her hand then came out of the purse, with the gun. She fell from her chair to the floor, and she and Linton began wrestling. She heard the gun discharge once, and then felt three more shots in her foot. She was wounded from these later shots, and her shoe came off her foot as a result. She next recalled that the owner, Mr. Williams, and Mr. Taylor, a police officer, came out of the kitchen. Linton was still walking at that time, and Silas was still threatening her. Eure's foot was bleeding profusely, and she told the two men she was going to the washroom until the police arrived.

As a result of this incident, Eure was charged with two counts of attempt (murder), one as to Silas and one as to Linton; she was charged with two counts of aggravated battery of Linton, based on both use of a weapon and conduct causing great bodily harm; finally, she was charged with two counts of armed violence, one premised upon the attempt (murder) of Silas, one based on the aggravated battery/great bodily harm count as to Linton.

The armed-violence charge based on the attempt (murder) was dismissed by the State prior to trial. At the close of the State's case, the court directed a verdict in defendant's favor on the attempt (mur-

der) count involving Silas. The remaining counts were submitted to the jury.

Prior to submission of the case to the jury, defendant requested a continuance to obtain testimony of two police officers. The officers had been served with subpoenas the day the trial commenced; defense counsel knew of the trial date five days prior to trial. The court denied the continuance, holding that the testimony of the officers was collateral, immaterial and cumulative of other evidence.

The trial court gave the jury the Illinois Pattern Jury Instructions (IPI), Criminal (2d ed. 1981) on the offenses, as follows:

"IPI No. 7.01    issues instruction on murder
IPI No. 6.05    definition instruction on attempt (murder)
IPI No. 6.07    issues instruction on attempt (murder)
IPI No. 11.05    definition instruction on battery
IPI No. 11.07    definition instruction on aggravated battery/ great bodily harm
IPI No. 11.08    issues instruction on aggravated battery; great bodily harm
IPI No. 11.10    issues instruction on aggravated battery/use of a deadly weapon
IPI No. 11.19    definition instruction on armed violence based on aggravated battery/great bodily harm
IPI No. 11.20    issues instruction on armed violence based on aggravated battery/great bodily harm."

The jury apparently did not receive the definition instruction (IPI Criminal 2d No. 11.09) on aggravated battery/use of a deadly weapon, and it received only one set of verdict forms on the charge of aggravated battery.

After deliberation, the jury returned guilty verdicts on the charges of aggravated battery and armed violence. The defendant was acquitted of the remaining attempt (murder) charge. As already noted, the court entered judgment only on the armed-violence charge, as it found the aggravated battery counts to have merged, and the defendant received the minimum sentence permitted, six years.

The defendant first argues that based on the Illinois Supreme Court's decisions in *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48, and *People v. Fernetti* (1984), 104 Ill. 2d 19, 470 N.E.2d 501, the armed-violence conviction cannot stand. Those two cases invalidated armed-violence convictions premised on the predicate felonies of voluntary manslaughter and involuntary manslaughter, respectively. The defendant argues that the prophylaxis afforded by

those two decisions must be expanded to include the felony of aggravated battery.

The defendant is apparently proceeding on dual theories, one legal and one factual. The legal challenge devolves essentially to the following assertion: the armed-violence statute, in light of these two decisions, permits the offense of aggravated battery to be punished more severely than the more serious offenses of voluntary or involuntary manslaughter, an anomalous result. The defendant therefore urges that this court extend the beneficial effect of *Alejos* to include the instant situation and bar the enhancement of aggravated battery to Class X/armed violence status. The defendant's factual argument reduces itself to this: When Ms. Eure armed herself, she neither knew the victims nor did she have any criminal intent. Therefore, she urges that the deterrent purposes of the armed-violence statute cannot be realized through use of that statute. Hence, she posits that the armed-violence statute is pre-empted.

An analysis of the defendant's arguments shows them to be fatally flawed; she both misreads the intent of *Alejos* and *Fernetti*, and fails to comprehend the essential purpose of the armed-violence statute. A correct reading of the above resolves the conundrum posited by the defendant and provides support for the conviction in these circumstances. While the protection of *Alejos* and *Fernetti* may apply to an armed violence/aggravated battery conviction in some instances, the facts here do not warrant such expansion.

■■ The armed-violence statute, as currently codified, elevates to Class X status the commission of any felony defined by Illinois law while armed with a deadly or dangerous weapon as therein defined. (Ill. Rev. Stat. 1983, ch. 38, pars. 33A—1(a)(b), 33A—2, 33A—3(a).) The statute was designed to address the increasing use of weapons in the commission of other offenses. "It appears obvious that the legislature intended, when it passed the armed-violence statute in 1967 (article 33A), to respond emphatically to the growing incidence of violent crime." (*People v. Graham* (1975), 25 Ill. App. 3d 853, 858, 323 N.E.2d 441.) In essence, by criminalizing the possession of a weapon in the commission of an offense, the salutary purposes of the statute are intended to be primarily deterrent. The underlying offense carries its own sentencing penalties prior to the application of the armed-violence statute; the latter addresses only the propinquity of a weapon to the underlying felony:

> "Even though the carrying of dangerous weapons in public is always fraught with some danger regardless of what the bearer is doing or intends to do, the armed-violence statute

stops short of criminalizing all possession of guns, knives or baseball bats. The commission of a felony while so armed provides the basis for assessing criminal penalties for the act of carrying a dangerous weapon in society, an act which is not in all instances criminal. *** The reason for the difference in treatment is presumably the belief that the chances that violence will erupt and cause great bodily harm because of the weapon are increased when a felony is committed; one who creates such danger by committing a felony while possessing the weapon is culpable and should bear the consequences for the danger his conduct poses. The stiff punishment mandated by the armed-violence provision is intended not only to punish the criminal and protect society from him but also to deter his conduct—that of carrying the weapon while committing a felony." (*People v. Alejos* (1983), 97 Ill. 2d 502, 508-09, 455 N.E.2d 48.)

The armed-violence statute must therefore be read as a strong statutory deterrent to carrying a dangerous or deadly weapon, the sanctions of which statute are activated when coupled with the commission of a felony.

Both *Alejos* and *Fernetti* reflect this view of the armed-violence statute. In *Alejos*, the defendant was convicted of armed violence predicated on the offense of voluntary manslaughter. The Illinois Supreme Court began its analysis by focusing on the unique nature of voluntary manslaughter:

"Because it requires that the defendant's act be motivated by either a sudden and intense passion resulting from serious provocation or an unreasonable but actual belief that the circumstances required the use of deadly force (Ill. Rev. Stat. 1979, ch. 38, pars. 9—2(a), (b)), voluntary manslaughter, by its common law as well as its statutory definition, is an unpremeditated crime, induced by sudden fear or duress and committed without time for proper reflection." (*People v. Alejos* (1983), 97 Ill. 2d 502, 507, 455 N.E.2d 48.)

The decision to kill, in other words, is a spontaneous and often instantaneous decision made by or forced upon an accused. Because the accused in such circumstances acts without time to reflect on his use of deadly force, the deterrent purposes of the armed-violence statute cannot be achieved by its employment in a voluntary manslaughter situation. Succinctly, crimes which by definition occur spontaneously, and without deliberation, are not subject to enhancement under the armed-violence statute.

This view was reaffirmed in *Fernetti*. After reasserting the nature of the *Alejos* decision, the court stated:

"[W]e find that application of the armed-violence statute to the offense of *involuntary* manslaughter would not further the intent of the legislature. Involuntary manslaughter, by statute, is defined by its "unintentional" nature. (Ill. Rev. Stat., 1981, ch. 38, par. 9—3(a).) It consists of the killing of a human being without any intent to do so. [Citations.] Accordingly, it is difficult to comprehend how the armed-violence provisions of the criminal code would be able to deter an unintentional act. We therefore find that the reasoning of *Alejos* is dispositive of the case at bar and decline to apply the armed-violence provisions to the felony of *involuntary* manslaughter." (Emphasis in original.) (*People v. Fernetti* (1984), 104 Ill. 2d 19, 24-25, 470 N.E.2d 501.)

Again, the crux of the decision was that definitionally, the underlying felony could not be deterred via the armed-violence statute's sanctions. Hence, that statute was inapplicable.

■ Viewed in this light, both the legal argument raised by defendant as well as the factual challenge must lapse. The defendant is superficially accurate in that an individual who commits either voluntary manslaughter or involuntary manslaughter is not subject to the onerous penalties of the armed-violence statute, as is the individual who commits the offense of aggravated battery. The armed-violence statute, however, does not seek merely to penalize the commission of the underlying felony, although that certainly is an inevitable adjunct of an armed-violence conviction. Rather, it seeks to deter the use of weapons in the commission of the predicate felony. As we have already noted, its sanctions are directed largely with an eye toward deterrence, and not with a narrow focus on the injury occasioned by the offense. In short, the gravamen of the armed-violence statute focuses on the offender, and not on the results of the offense.

Both *Alejos* and *Fernetti* were legal analyses of the underlying felonies as they impacted on the offender. Viewed from this perspective, the court determined that where the predicate felony was either involuntary manslaughter or voluntary manslaughter, no deterrence would follow application of the armed-violence provisions, for in neither case was there any premeditation or deliberation on the part of the accused. Thus, as a matter of law, regardless of the particular facts of either predicate offense, the armed-violence statute was inapplicable.

This same analysis does not necessarily apply to the underlying offense of aggravated battery. Unlike involuntary or voluntary manslaughter, aggravated battery contains a specific intent and lacks mitigating factors. (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 452 N.E.2d 857.) Indeed, it is an enhanced, not a reduced offense. (Ill. Rev. Stat. 1983, ch. 38, pars. 12—3, 12—4.) It cannot be said, therefore, that the use of a weapon in the commission of aggravated battery causing great bodily harm cannot be deterred. The decision to so use a weapon is not one forced on an accused, as in voluntary manslaughter/unreasonable belief in self-defense, nor is it a spontaneous decision, as in voluntary manslaughter/sudden and intense passion. It is an intent offense, unlike involuntary manslaughter. The use of a weapon in such a case can be deterred; the purposes of the armed-violence statute may therefore be achieved by application of that offense to the predicate felony of aggravated battery.

This issue was addressed in *People v. Decker* (1984), 126 Ill. App. 3d 428, 467 N.E.2d 366. There, the court noted:

> "Certainly the death of the victim is one respect in which voluntary manslaughter is more serious than the offense here of armed violence [based on aggravated battery causing great bodily harm]. But that circumstance is inherent in every comparison of voluntary manslaughter with an offense in which no one is killed, and if that were the only criterion, then armed violence with a category I weapon—the Class X offense—could never be predicated on a nonfatal felony. We do not think that the court in *Alejos* intended that result. In other respects, such as the offender's motive, voluntary manslaughter is less serious than the conduct in question here." (126 Ill. App. 3d 428, 435.)

Accordingly, the surface incongruity of applying the armed-violence statute to aggravated battery, a nonfatal felony, and not to either voluntary or involuntary manslaughter, is merely a phantom paradox. The underlying felony is properly the subject of its own sentencing provisions; the armed-violence provision addresses only the proximity of a weapon to the offense, and then only in circumstances, like those here, where deterrence may validly obtain from that application.

This is not to say that aggravated battery will always be subject to the armed-violence statute. It is conceivable that an individual can be charged and convicted of voluntary manslaughter, aggravated battery causing great bodily harm, and armed violence based on the aggravated battery, all arising out of the same physical act. In such cir-

cumstances, only one conviction may validly be entered. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) Since the conduct causing the offenses includes the mitigating factor of either unreasonable belief in self-defense or a sudden and intense passion, the provisions of the armed-violence statute would be inoperative. (*People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48; *People v. Fernetti* (1984), 104 Ill. 2d 19, 470 N.E.2d 501.) The State may not avoid the salutary effect of those decisions by seeking a voluntary manslaughter verdict and an armed-violence verdict based on the predicate felony of aggravated battery. To permit such action by the State would be to utterly frustrate the intent of the *Alejos* and *Fernetti* decisions.

As to defendant's legal argument, this final observation is notable. Defendant apparently is proceeding on the theory that had Linton died, she would only be guilty of voluntary manslaughter, since she was acquitted of attempt (murder). However, the jury may have acquitted her of that charge because it found that she did not have the intent to kill, although she did have the intent to cause great bodily harm. Only an intent to kill will suffice for an attempt (murder) conviction. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 9, 473 N.E.2d 1270.) Had Linton died, a murder conviction may have been entered by the jury based on the intent to cause great bodily harm. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1).) Had this occurred, neither *Alejos* nor *Fernetti* would bar use of the provisions of the armed-violence statute against Eure.

■ As to defendant's factual argument, we find it equally infirm. Essentially, defendant argues that at the time she armed herself, she had no criminal intent. Therefore, she urges that her conduct could not be deterred. This addresses the problem at the wrong point in time. The armed-violence statute does not criminalize all possession of weapons; rather, as we have already noted, it penalizes the proximity of a weapon to the commission of the predicate felony. The crucial point in time is not when an accused arms himself, it is when the underlying offense is committed. (*People v. Alejos* (1983), 97 Ill. 2d 502, 508, 455 N.E.2d 48.) Whatever might be said of the defendant's motivations and intentions when she armed herself, the fact remains that the jury convicted her of the aggravated battery of Linton. The jury thus found, beyond a reasonable doubt, that the defendant "intentionally or knowingly cause[d] great bodily harm" to Linton. (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a).) Her intent, even if initially innocent, was not so at the time of the commission of the offense, the crucial time for purposes of armed violence. The potential for violence increases when weapons are present, and a defend-

ant may not evade culpability for the use of the weapon merely because it was not his or her original intent to do so. (*People v. Alejos* (1983), 97 Ill. 2d 502, 508-09, 455 N.E.2d 48.) The deterrent purposes of the statute are satisfied by its application to the offense of aggravated battery herein, for the defendant's decision to use the weapon was neither an instantaneous decision, nor was it one forced upon her. In convicting her, the jury impliedly rejected defendant's contention that the discharge of the gun was an accident. To the contrary, the jury accepted the victim's testimony, that the defendant took out her gun, held it on the victim for in excess of five minutes, and then shot him. Clearly, she had more than ample time to reflect on her use of the gun, and chose to fire. The armed-violence statute's deterrent objective was clearly designed for such conduct. Accordingly, the defendant's factual argument must fall.

■ The defendant next cites as error the trial court's failure to give the definition instruction on the charge of aggravated battery/use of a deadly weapon. The jury did receive the issues instruction on that offense, as well as both the definition and issues instructions on aggravated battery/great bodily harm. The jury was provided only one set of verdict forms on the offense of aggravated battery, and found Ms. Eure guilty of that offense without specifying which theory was established. No judgment of conviction was entered on that verdict, however, the court finding that the aggravated battery charges merged with the armed-violence verdict, upon which the defendant received the minimum sentence allowed, six years.

It is well recognized that an accused may validly appeal from adverse final judgments of a trial court. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223. That right is conditional, however:

> "The final judgment in a criminal case is the sentence, and, in the absence of the imposition of a sentence, an appeal cannot be entertained.
>
> \*\*\* Although the notice of appeal in the record appeals from the three armed-violence convictions, the three unlawful-restraint convictions, as well as the three murder convictions and the death penalty, sentence was imposed only on the murder convictions. For this reason, the armed-violence convictions and the unlawful-restraint convictions are not before this court." (102 Ill. 2d 23, 51, 464 N.E.2d 223.)

Since no judgment of conviction was entered on either of the aggravated battery charges, nor was there any sentence imposed on either offense, the defendant is normally barred from challenging them on appeal.

Defendant herein however is not directly challenging the aggravated battery charges themselves; rather, she is apparently addressing the impact of this alleged inadequacy of the instructions on the armed-violence count for which she was sentenced. As noted in the first issue, the armed-violence charge, on which the defendant received a six-year sentence, included the predicate felony of aggravated battery/great bodily harm. The State was thus required to prove, in order to meet its burden, all of the elements of the predicate felony beyond a reasonable doubt. A failure to do so would preempt a conviction for the enhanced offense of armed violence. *People v. Frias* (1983), 99 Ill. 2d 193, 203, 457 N.E.2d 1233.

The adequacy of the instructions on the predicate felony herein, however, has not been raised on appeal. To the contrary, the jury received both the IPI definition instruction on aggravated battery/great bodily harm, as well as the issues instruction on that offense. Since the complained of instruction, on aggravated battery/use of a deadly weapon, was not involved in the armed-violence conviction and sentence, *Caballero* mandates that this purported error is not cognizable on appeal.

Nor can the defendant claim that she was prejudiced by the jury's reception of partial instructions on aggravated battery/use of a deadly weapon.

> "It is true that prejudice is the natural result of erroneously instructing the jury on an *uncharged* offense, since it cannot be shown whether the jury followed the correct or the erroneous instruction. [Citations.] However, that danger does not exist where, as here, the jury was instructed only as to *charged* offenses and returned verdicts of guilty on each charge." (Emphasis in original.) (*People v. Olson* (1984), 128 Ill. App. 3d 560, 563, 470 N.E.2d 1176.)

In *Olson*, as here, the jury received instructions on charged offenses for which no sentence was ultimately imposed (there because the State nol-prossed the charges prior to sentencing). Since no prejudice resulted here from the purported inadequacy of the instructions, and no sentence was imposed on that offense in any event, no reversible error occurred.

■■ Our conclusion that no reversible error occurred is buttressed by other considerations. Generally, a party desiring a particular jury instruction must submit it to the trial court and request that it be given to the jury in order to allege error for the failure to so instruct the jury. (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487.) Here, the defendant neither requested the definition in-

structions now complained of, nor did defendant object at trial to its absence. Moreover, it is well recognized that jury instructions are to be read as a whole, and if, when so considered, they correctly and adequately instruct the jury, any purported error is rendered harmless. (*People v. Dowd* (1981), 101 Ill. App. 3d 830, 845, 428 N.E.2d 894; *People v. Witanowski* (1982), 104 Ill. App. 3d 918, 923, 433 N.E.2d 334; *People v. Terry* (1984), 99 Ill. 2d 508, 516, 460 N.E.2d 746.) Here, the jury was informed that in order to convict the defendant, the State was obligated to establish certain factors beyond a reasonable doubt. While it certainly would have been preferable to also give the jury the definition instruction on that offense, we fail to discern how defendant was compromised by its absence in light of the fact that no judgment of conviction was entered.

■ The defendant next alleges as error the trial court's denial of a continuance, requested midtrial, for the purpose of obtaining the testimony of two police officers who were involved in the investigation of the incident. The defendant contended that one of the officers would testify that he interviewed Linton, and was told by Linton that he had been drinking the night of the incident. The second officer would testify that when interviewed following the incident, neither Linton nor Silas told him that the owner required them to say the incident occurred outside the lounge before an ambulance would be called.

The decision to grant or deny a continuance is one that rests in the sound discretion of the trial court, and that decision will not be disturbed on review absent a clear abuse of that discretion. (*People v. Robinson* (1984), 121 Ill. App. 3d 1003, 1007, 460 N.E.2d 392.) No such abuse is present here.

The evidence which defendant sought to introduce would be cumulative of evidence already introduced. Both Linton and Silas testified that they picked up drinks at the tavern. The fact that a police officer would testify that Linton "had been drinking" would therefore add nothing to the evidence already before the jury, and would not provide the alleged impeachment of Linton argued by the defendant. As such, it was cumulative, and the trial court's denial of a continuance to obtain the officer's testimony on this point was not an abuse of discretion.

Similarly, the allegation that the owner of the lounge, Mr. Williams, required Silas and Linton to lie before an ambulance would be summoned was already before the jury. Linton and Silas had both testified to this allegation, and both Williams and Adolph Taylor, the off-duty policeman at the lounge, had denied this allegation. The fact

that Linton and Silas had not told the investigating officer this fact would thus be cumulative, as the inconsistency was already before the jury. We cannot therefore say that the trial court abused its discretion in denying a continuance to obtain the officer's testimony on this point.

■ Finally, the defendant cites as error the State's closing argument. During the course of argument, the prosecutor urged the jury not to be "intimidated" by defense counsel's "game." Having reviewed the entire transcript, we cannot find that these comments amount to reversible error.

> "It is an oft-repeated principle that a prosecutor is to be permitted great latitude in his closing argument (*People v. Hine* (1980), 88 Ill. App. 3d 671, 679, 410 N.E.2d 1017), and the trial court's determination of the propriety of such an argument will not be disturbed on review absent extreme error (*People v. Maldonado* (1981), 101 Ill. App. 3d 948, 951, 428 N.E.2d 1087, *appeal denied* (1981), 85 Ill. 2d 571). The standard for determining if prosecutorial comments made during closing argument constitute reversible error is whether those remarks were such that, without their having been made, the jury might have reached a different result. (*People v. Barnes* (1983), 117 Ill. App. 3d 965, 978, 453 N.E.2d 1371; *People v. Panczko* (1980), 86 Ill. App. 3d 409, 413, 407 N.E.2d 988.)" *People v. Reese* (1984), 121 Ill. App. 3d 977, 986, 460 N.E.2d 446.

In the instant case, defense counsel referred to a police officer, called by the State, as an "interesting man. And [he] knows how to play the game." Clearly, the prosecutor's responses here were invited rejoinders to this line of argument of the defendant. It is well-recognized that a party may not invite such comments and then assert them as error. (*People v. Thomas* (1984), 121 Ill. App. 3d 883, 892, 460 N.E.2d 402.) In any event, it is clear that these comments, even if improper, did not result in prejudice to the defendant.

Accordingly, the judgment of the trial court must be affirmed.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.