THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL RENEHAN, Defendant-Appellant.

First District (6th Division)   No. 1—90—0285

Opinion filed March 6, 1992.

Randolph N. Stone, Public Defender, of Chicago (Julie M. Campbell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

After a jury trial, defendant, Daniel Renehan, was convicted of aggravated battery based on great bodily harm, aggravated battery based upon a deadly weapon, and armed violence. (Ill. Rev. Stat. 1989, ch. 38, pars. 12—4(a), 12—4(b)(1), 33A—2.) The underlying felony for the armed violence conviction was aggravated battery based upon great bodily harm. (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(a).) The circuit court of Cook County entered judgment on the convictions and sentenced defendant to a six-year term on the armed violence conviction and two five-year terms on the aggravated battery convictions to run concurrently.

Defendant's appeal raises four issues: (1) whether the State improperly shifted the burden to defendant at trial when it questioned defendant about potential witnesses; (2) whether the trial court's jury instruction on self-defense was proper; (3) whether the armed violence conviction may stand in light of the Illinois Supreme Court's decisions in *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48, and *People v. Fernetti* (1984), 104 Ill. 2d 19, 470 N.E.2d 501; and (4) whether the armed violence conviction based upon aggravated battery constituted a double enhancement.

Paul Duke, the victim, testified that he and defendant originally met at a bar through a mutual friend. Several days later, Duke moved into defendant's apartment, paying rent weekly. Duke did landscape work for defendant for several months, but then found another job. He continued to reside in defendant's apartment.

On February 16, 1989, Duke and a co-worker arrived at the bar in the afternoon and began drinking beer. About one hour later, defendant arrived, and began drinking. Duke testified that defendant was angry at Duke for not speaking to him when he arrived at the bar and asked Duke if he and the co-worker had been talking about him.

Duke responded that they had not been talking about him. When defendant repeatedly accused Duke of talking behind his back, Duke moved away. Duke stated that defendant left the bar angry because he believed that Duke and others had been talking and laughing about him. Duke left the bar about one hour later and walked to the apartment. Duke opened the two outer doors of the building, but did not have a key to the lock on the apartment door. He knocked on the door and defendant let him in, but they did not speak. Duke turned on the television, sat on the sleeper sofa in the living room and fell asleep for several minutes. When he awoke, he went into the kitchen, where defendant was preparing a meal. Duke made some popcorn and returned to the living room. When he went back to the kitchen to get a drink, defendant asked why he had been talking about him. Duke responded that he had not been talking about defendant and that he was tired of hearing about it. Defendant accused Duke of lying and was very upset. When Duke moved toward the refrigerator, defendant said, "Don't come near me," to which Duke responded, "I'm not going near you. I'm going to the refrigerator." As Duke opened the refrigerator door, he felt a knife going into his stomach. He saw defendant's hand and the knife handle near his stomach. After Duke pushed defendant away with his hand, defendant moved toward Duke and stabbed him again. Defendant repeatedly stated, "You made me do it."

Two police officers testified for the State. Officer Moroney testified that when he and Officer Piscopo arrived at the scene, defendant met them at the door and led them up to the apartment. Moroney did not observe any injuries on defendant, but stated that he was "shaken up." Moroney saw a bloody knife on the floor, then went into the kitchen, where he saw Duke holding his stomach, leaning against the table in a blood-soaked shirt. Officer Sanders testified that when he arrived at the scene, he checked the back door while Moroney and Piscopo entered the building. When Sanders subsequently entered the apartment, Moroney told Sanders that the victim said that defendant stabbed him. Sanders placed defendant under arrest, and defendant said, "Why me, I'm the one that called the police." According to Sanders, defendant then lunged toward the door but two officers grabbed and handcuffed him.

Defendant testified on his own behalf that he arrived at the bar on the afternoon of the stabbing and began drinking beer. Duke arrived about two hours later, ordered some beer and sat with his girl friend. Defendant and Duke did not speak to each other. Defendant stated that he talked to a friend for 10 to 15 minutes, then went to

the other end of the bar where he talked with Duke's supervisor for about 10 minutes, and watched television. Defendant then walked home. At home, defendant watched television and cooked dinner. He fell asleep shortly after 7 p.m. and was awakened by a very loud pounding on the door. He let Duke in, whom he described as "very aggressive" and talking loudly. Defendant smelled alcohol on Duke's breath. Duke angrily yelled that defendant had no business talking to Duke's supervisor at the bar and that as a result Duke had been placed on probation. Duke called defendant a "wimp" and stated that he could "wipe the walls with [his] four-eyed hind end." Defendant testified that he then "got up off the couch *** and I looked at [Duke] straight in the eye, standing toe-to-toe," and said, "That's not going to be easily accomplished." Duke then "slammed [him] against the wall" and pushed him. When he told Duke that he would call the police, Duke "ridiculed him." Duke pushed him several more times, into the kitchen table, into the microwave cart and finally into the wall. When Duke moved his hands toward defendant's neck, defendant reached to the counter for a knife sharpener which broke in his hand. As he reached, Duke continued to slam him into the wall. Defendant then reached to the counter for a knife and told Duke that if he did not stop he would be forced to use the knife. Duke started coming at him, placed his hands on defendant's neck, squeezed it and defendant gasped for air. Defendant then stabbed Duke twice.

Defendant called the police, who arrived within a few minutes. He told the officers what happened and was taken to the police station, where he signed a form waiving his rights. He then wrote a statement and spoke with Officer William Johnson. Defendant did not write in his statement or tell Johnson that Duke choked him or that Duke slammed him against the wall or a microwave cart.

Officer Johnson testified in rebuttal that he spoke with defendant at the police station about one-half hour after the stabbing. Defendant gave Johnson a 15- to 20-minute narrative, oral statement. Then, at his own request, defendant spent about 20 minutes preparing a written statement. Defendant never told Johnson nor did the written statement indicate that Duke choked or strangled defendant, or slammed him into the wall or a microwave cart.

The parties stipulated that Dr. Wendy Marshall would testify that she performed exploratory surgery on Duke for multiple stab wounds to the abdomen, and that Duke remained hospitalized for six days. It was also stipulated that a toxological reading revealed that Duke was intoxicated.

Initially, we consider defendant's claim that the prosecutor improperly shifted the burden of proof to defendant during cross-examination.

Defendant testified that after a loud verbal altercation lasting about 15 minutes, the victim attacked him and he stabbed the victim twice in self-defense. Defendant stated that neighbors heard the yelling, but were too frightened to assist him. On cross-examination, the prosecutor asked defendant if any of the neighbors were present in court to testify. The trial court sustained defendant's objection to the question.

■■ Despite defendant's objection to the question, he did not raise the issue of burden shifting by post-trial motion and has therefore waived it on review. More importantly, we do not believe that the jury would believe defendant had the burden to produce evidence to create reasonable doubt as a result of the State's isolated reference to the absence of neighbors' testimony. Any error in the asking of the question was harmless, particularly in view of the trial court's prompt action in sustaining defendant's objection.

We next consider defendant's contention that the self-defense instruction given by the trial court denied him a fair trial. Illinois Pattern Jury Instructions, Criminal, No. 24—25.06 (2d ed. 1981) provides, in pertinent part, that force likely to cause great bodily harm or death is justified to prevent similar harm to oneself or to prevent the commission of a forcible felony. The trial court here instructed the jury on use of force to prevent harm to oneself, but refused defendant's request to include the "forcible felony" language.

On appeal, defendant maintains that he believed that the forcible felony of aggravated battery based upon the use of a deadly weapon or voluntary manslaughter was about to be committed, that this was a question for the jury, and that the "forcible felony" language was warranted.

In *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144, and *People v. Chamness* (1984), 129 Ill. App. 3d 871, 473 N.E.2d 476, this court found meritless the same argument advanced by defendant here. In *Chamness*, defendant was convicted of armed violence, aggravated battery and attempted murder. As here, the trial court gave a self-defense instruction, but refused to include the "forcible felony" language. On appeal, this court affirmed, finding that defendant received the jury's informed consideration on self-defense, and that any instructional error was harmless. The court wrote:

"When a jury determines whether a defendant acted to protect himself from great bodily harm or death, it necessarily

considers the same evidence which would be involved in a determination of whether that defendant acted to prevent the commission of an attempted murder or aggravated battery upon himself. There is no logic in the suggestion that a jury which found that a defendant was not protecting himself from great bodily harm or death could find that that defendant was trying to prevent an attempted murder or aggravated battery from being committed upon himself." (*Chamness*, 129 Ill. App. 3d at 876, 473 N.E.2d at 480.)

In *Hanson*, this court adopted the analysis in *Chamness* and affirmed defendant's conviction.

■ Under *Chamness* and *Hanson*, we believe that defendant in the present case received the jury's informed consideration of his self-defense theory. The offenses of voluntary manslaughter and aggravated battery (Ill. Rev. Stat. 1983, ch. 38, pars. 9—2, 12—4) each require a level of force which is likely to cause great bodily harm or death. Because the jury apparently determined that defendant was not protecting himself from death or great bodily harm, the jury could not have found that defendant was attempting to prevent voluntary manslaughter or aggravated battery from being committed upon him. As such, defendant received the jury's informed consideration of his self-defense theory and any error in the court's refusal to include the forcible felony language was harmless.

Defendant next contends that his armed violence conviction cannot stand based upon our supreme court's decisions in *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48, and *People v. Fernetti* (1984), 104 Ill. 2d 19, 470 N.E.2d 501. In these cases, the court held that neither voluntary nor involuntary manslaughter, respectively, could form the basis for an armed violence conviction. Defendant claims that the protection afforded by these two decisions by analogy applies to an aggravated battery conviction where defendant asserted a self-defense claim. We disagree.

The Illinois armed violence statute makes it a Class X felony to commit "any felony defined by Illinois Law" while armed with a dangerous weapon. (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2.) The legislature enacted the armed violence statute in 1967 "to respond emphatically to the growing incidence of violent crime." *People v. Graham* (1975), 25 Ill. App. 3d 853, 858, 323 N.E.2d 441, 444.

In *People v. Alejos*, defendant was convicted of voluntary manslaughter and armed violence based upon voluntary manslaughter. The court held that voluntary manslaughter could not be the predicate felony under the armed violence statute based upon the nature of the

underlying felony and the legislative intent. Specifically, the *Alejos* court stated:

> "The stiff punishment mandated by the armed-violence provision is intended not only to punish the criminal and protect society from him but also to deter his conduct—that of carrying the weapon while committing a felony." (*Alejos*, 97 Ill. 2d at 509, 455 N.E.2d at 51.)

The court noted that voluntary manslaughter, by both common law and statutory definition (Ill. Rev. Stat. 1989, ch. 38, par. 9—2), is an "unpremeditated crime, induced by sudden fear or duress and committed without time for proper reflection." (*Alejos*, 97 Ill. 2d at 507, 455 N.E.2d at 50.) Because by definition one who commits voluntary manslaughter does not intend to take a life or employ deadly force, the court found it improbable that the armed violence provision would deter those who would commit voluntary manslaughter from using a dangerous weapon. The court therefore refused to allow voluntary manslaughter to serve as the predicate felony under the armed violence statute.

The supreme court adopted the same reasoning when involuntary manslaughter was the predicate felony. (*People v. Fernetti*, 104 Ill. 2d 19, 470 N.E.2d 501.) There, the court again relied upon the underlying felony and the legislative intent. In two consolidated cases, defendants were convicted of involuntary manslaughter and armed violence, and sentenced only for armed violence to the six-year minimum term. Referring to *Alejos*, the court wrote:

> "In reaching this decision, we noted that a conviction for voluntary manslaughter is an acknowledgement by the trier of fact that a defendant either acted under a sudden and intense passion resulting from serious provocation [citation], or an unreasonable but actual belief that the circumstances required the use of deadly force." (*Fernetti*, 104 Ill. 2d at 24, 470 N.E.2d at 503.)

The court in *Fernetti* noted that involuntary manslaughter by statute is defined for its "unintentional" nature and consists of the killing of a human being without the intent to do so. Under the reasoning of *Alejos*, the court declined to apply the armed violence provisions to the felony of involuntary manslaughter.

■ Initially, we note that defendant does not claim that aggravated battery is not a proper predicate felony for armed violence in all situations. Rather, defendant maintains that *Alejos* and *Fernetti* apply when defendant is charged with aggravated battery and raises self-defense. We do not believe, however, that the present case is anal-

ogous to *Alejos* and *Fernetti*. The court in those cases indicated that the armed violence statute could not by definition deter the manslaughter offenses, and was therefore inapplicable. The defendants' manslaughter convictions in *Alejos* and *Fernetti* indicated that the juries "acknowledged" the presence of mitigating factors, specifically either that defendants acted under a sudden and intense passion or from an unreasonable but actual belief that deadly force was required. Clearly, in such situations, the armed violence statute could not deter the use of a weapon. By contrast, after the jury here heard the evidence surrounding defendant's stabbing of the victim and was instructed on the self-defense claim, it found defendant guilty of two counts of aggravated battery and armed violence. Thus, the jury here apparently rejected defendant's claim that he acted in self-defense. Defendant's analogy overlooks this critical distinction. We cannot say, as defendant claims, that raising a self-defense claim is the equivalent of a jury's conviction for voluntary or involuntary manslaughter. Neither the rationale of *Alejos* and *Fernetti* nor legislative intent supports such an interpretation.

Moreover, battery is a specific intent crime which is not reduced by mitigating factors. (*People v. Clay* (1987), 165 Ill. App. 3d 68, 518 N.E.2d 659.) In *Clay*, this court stated that voluntary manslaughter and battery have different mental states, distinguishing them as follows:

> "Voluntary manslaughter, although committed knowingly or intentionally, contains certain mitigating factors ***[—]a sudden and intense passion resulting from a serious provocation [citation], or an unreasonable but actual belief that the circumstances required the use of deadly force [citation]. *** Battery is not reduced or negated because of these mitigating factors. [Citation.] If one strikes another causing bodily harm because of an unreasonable but actual belief that the force is necessary, a battery is nevertheless committed." (*Clay*, 165 Ill. App. 3d at 70, 518 N.E.2d at 661.)

The court acknowledged that although battery may encompass both premeditated and unpremeditated acts, battery, unlike manslaughter, is not reduced or negated by mitigating factors. Relying upon *Alejos* and *Fernetti*, the court, however, held that where convictions are returned for both armed violence and voluntary manslaughter arising under the same set of facts, judgment may be entered only upon the voluntary manslaughter conviction.

We find *People v. Eure* (1986), 140 Ill. App. 3d 387, 488 N.E.2d 1267, cited by both parties in support of their positions, well reasoned

and instructive. In *Eure*, defendant was convicted of two counts of aggravated battery and armed violence. The trial court entered judgment based only upon the armed violence conviction. This court concluded that aggravated battery causing great bodily harm was a proper predicate felony for armed violence, although "in some instances" the protection of *Alejos* may apply. (*Eure*, 140 Ill. App. 3d at 392, 488 N.E.2d at 1270.) In so deciding, the court noted that the "crux" of *Alejos* and *Fernetti* was that "definitionally" the underlying manslaughter felonies could not be deterred by the armed-violence statute, writing: "[A]s a matter of law, regardless of the particular facts of either predicate offense, the armed violence statute was inapplicable." (*Eure*, 140 Ill. App. 3d at 394, 488 N.E.2d at 1272.) The court stated that the same analysis did not necessarily apply to aggravated battery as an underlying offense because aggravated battery contains a specific intent and lacks mitigating factors, unlike the manslaughter offenses. The court concluded that the use of a weapon in the commission of aggravated battery causing great bodily harm *could be deterred* by the armed violence statute. The court, however, gave the following example of when aggravated battery may not be subject to the armed violence statute:

> "It is conceivable that an individual can be charged and convicted of voluntary manslaughter, aggravated battery causing great bodily harm, and armed violence based on the aggravated battery, all arising out of the same physical act. In such circumstances, only one conviction may validly be entered. [Citation.] Since the conduct causing the offenses includes the mitigating factor of either unreasonable belief in self-defense or a sudden and intense passion, the provisions of the armed-violence statute would be inoperative." *Eure*, 140 Ill. App. 3d at 395-96, 488 N.E.2d at 1273.

We believe that the *Eure* court's analysis is sound and consistent with the court's rationale in *Alejos*. Under *Eure*, *Alejos* applies only when defendant is convicted of a manslaughter offense in addition to the aggravated battery and armed violence. Because defendant here was not convicted of a manslaughter offense which amounts to an acknowledgement by the jury that mitigating factors existed, defendant's argument fails.

*People v. Drakeford* (1990), 139 Ill. 2d 206, 564 N.E.2d 792, also supports our reasoning. In *Drakeford*, the trial court sentenced defendant for armed violence predicated upon aggravated battery, but entered no conviction for the second degree murder. This court vacated defendant's armed violence conviction and remanded for sen-

tencing on the second degree murder conviction. The supreme court affirmed based upon *Alejos*, stating that the second degree murder conviction indicates that the jury found defendant's conduct "unpremeditated, undeterrable, and caused by an actual but unreasonable belief that the circumstances required the use of deadly force in self-defense." (*Drakeford*, 139 Ill. 2d at 213-14, 564 N.E.2d at 795-96.) The court in *Drakeford* thus reaffirmed the rationale of *Alejos* that the legislature did not intend the armed violence statute to apply to conduct constituting second degree murder.

As to this issue, we decline to follow the holding of *People v. Allen* (1991), 218 Ill. App. 3d 930, 578 N.E.2d 1193, *appeal allowed* (1991), 142 Ill. 2d 656. In *Allen*, as here, defendant was charged with attempted murder, aggravated battery and armed violence predicated on aggravated battery, and presented the defense of self-defense. The jury was unable to reach a verdict on attempted murder, but defendant was found guilty of the other charges and was sentenced under the armed violence statute. This court remanded to the trial court with directions to vacate the armed violence conviction. The court stated that based upon *Drakeford*, it could consider mitigating factors, such as the lack of premeditation or an unreasonable belief in the need for self-defense. We do not believe that *Drakeford* supports such expansion of *Alejos* and therefore decline to follow *Allen*. Nor do we believe that the battery or armed violence statute gives us authority to consider mitigating factors, and without such legislative mandate, we decline to do so.

■ Defendant's final contention is that his conviction constitutes an impermissible double enhancement under *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627, because both armed violence and aggravated battery require the use of a deadly weapon. We find, however, that because the predicate felony for defendant's armed violence conviction was aggravated battery causing great bodily harm (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(a)), which does not require the use of a weapon, defendant's argument fails.

In *People v. Haron*, the underlying felony for defendant's armed violence conviction was aggravated battery based on the use of a deadly weapon. (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(1).) The court stated that the legislature did not intend that the presence of a weapon would enhance a misdemeanor to a felony and also serve as the basis for an armed violence charge. Therefore, the court concluded that the armed violence statute requires a predicate offense which is a felony without enhancement through the presence of a weapon, and consequently dismissed the armed violence count.

We find *People v. Hugues* (1991), 230 Ill. App. 3d 192, relied on by the State, dispositive of this issue. In that case, defendant was charged with armed violence and aggravated battery causing great bodily harm under section 12—4(a). (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(a).) On appeal, the defendant requested this court to extend *Haron* to aggravated battery causing great bodily harm. This court rejected defendant's argument, noting the *Haron* court's suggestion that a different result would occur if defendant had been charged under section 12—4(a). The *Haron* court stated:

> "Although it would appear that the aggravated-battery charge could have been based on section 12—4(a), the aggravated-battery count against Haron charges that in committing the offense he used a deadly weapon [citation]. Thus the enhancement of the offense of battery to that of aggravated battery was based on the use of a deadly weapon." (*Haron*, 85 Ill. 2d at 277, 422 N.E.2d at 634.)

*Haron* also indicated that it had previously distinguished aggravated battery under section 12—4(a) from armed violence predicated on aggravated battery under section 12—4(b). The *Hugues* court therefore found defendant's reliance on *Haron* misplaced and affirmed defendant's conviction and sentence for armed violence.

In this case, defendant was charged and convicted of aggravated battery under both sections 12—4(a) and 12—4(b). However, the indictment indicates that the underlying felony for the armed violence charge was aggravated battery causing great bodily harm. The presence or use of a weapon is not an element of aggravated battery causing great bodily harm, and this offense may therefore serve as the predicate offense for armed violence even though a weapon caused the harm. (See *People v. Garcia* (1981), 103 Ill. App. 3d 779, 431 N.E.2d 1234.) Moreover, we believe that the deterrent purposes of the armed violence statute are satisfied by its application here.

*People v. Decker* (1984), 126 Ill. App. 3d 428, 467 N.E.2d 366, also supports our result. In *Decker*, this court held that defendant's armed violence conviction predicated on aggravated battery under 12—4(a) did not constitute double enhancement of her use of a gun in committing the act, even though the gun caused the great bodily harm. The court wrote:

> "The presence or use of a weapon is not an element of aggravated battery causing great bodily harm, so therefore that offense may serve as the predicate felony for armed violence even though *** the evidence adduced at trial shows that the

harm was caused by the dangerous weapon." *Decker*, 126 Ill. App. 3d at 432, 467 N.E.2d at 370.

Defendant's reliance on *People v. Petrovic* (1981), 102 Ill. App. 3d 282, 430 N.E.2d 6, is misplaced. In *Petrovic*, this court reversed defendant's armed violence conviction because it found that the enhancement of battery to aggravated battery was based on the use of a deadly weapon. By contrast, defendant's armed violence conviction here was clearly based on his conduct causing great bodily harm, and *Petrovic* is therefore distinguishable.

We conclude that defendant's use of a knife was not doubly enhanced and his conviction for armed violence predicated on aggravated battery causing great bodily harm is not contrary to *Haron*.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RAKOWSKI and LaPORTA, JJ., concur.