THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS SCHORLE, Defendant-Appellant.

First District (4th Division) No. 1—88—1548

Opinion filed November 29, 1990.

Barry Sheppard and Sue Augustus, both of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Gael O'Brien, Special Assistant State's Attorney, and Inge Fryklund, Assistant State's Attorney, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Dennis Schorle, was charged with murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)) and armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—1 *et seq.*) by indictment. Following a bench trial, defendant was found guilty of murder and sentenced to a term of 20 years in the Illinois Department of Corrections.

The following issues are before this court for review: (1) whether the trial court erred when it ruled that the victim's admission to her husband that she committed adultery did not constitute sufficient provocation to warrant a finding of voluntary manslaughter; (2) whether the State proved beyond a reasonable doubt that defendant was not acting under a sudden and intense passion resulting from provocation by his wife; and (3) whether the trial court's ruling that defendant was sane at the time of the murder was supported by the evidence.

We affirm.

BACKGROUND

Marvin Hamman, a Rolling Meadows police detective, arrived at defendant's home at 2805 Wilke Road on the night of April 9, 1987,

at 5:30 p.m. He found Mrs. Delores Schorle on the kitchen floor, moaning and bleeding profusely. Detective Hamman found a pistol on the kitchen counter. Dr. Mitra Kalelkar performed an autopsy on Delores Schorle. Mrs. Schorle died as a result of multiple gunshot wounds. She had one bullet wound in the back of her head, one in her shoulder, one in her right upper arm, and one in her left lower back. Detective Hamman found a shot glass and a .22 caliber pistol on the kitchen counter. The gun had a safety latch which had to be unlatched before it would fire.

Defendant was arrested by police officer Steven Schuster of the Rolling Meadows police department on April 9, 1987, and placed in a squad car. After approximately 10 minutes, defendant began striking the window of the squad car with his head.

Soon after, Officer Schuster drove defendant to the police station. Defendant began talking about the incident en route, although Officer Schuster did not ask defendant any questions. Defendant stated that his wife spent the previous Friday night with another man.

Defendant next stated that he received an anonymous telephone call from a man on April 9, 1987, who said, "Pal, I want to help you— call this number." Defendant maintained that he called the number and that the number was answered by an answering machine message. The message was recorded by a man named "J.J." Defendant then told Officer Schuster that he called his wife, Delores, at work and asked her if she knew "J.J." Mrs. Schorle admitted that she knew J.J. and that she and J.J. spent the previous Friday night together. Mrs. Schorle agreed to meet defendant at home at 5:30 p.m. to discuss their marital problems.

Defendant told the officer that he left work early and arrived home around 4 p.m.; once there, he began drinking. He maintained that he called some of his friends to discuss his problems, but no one had time to talk. Defendant got a gun and loaded it. He placed the loaded gun under a cushion in a seat in the family room.

When his wife arrived home, he asked her if she enjoyed her night with J.J., and she admitted that she did. Defendant responded by taking out the gun. Defendant began shooting his wife as she ran toward the back door. Defendant told the officer that he became angry when his wife said she enjoyed her evening with J.J. He said that his first thought after loading the gun was to shoot himself, and that he did not know why he did not kill himself. Officer Schuster did not ask defendant any questions after defendant relayed this story.

Defendant's neighbor, Valentino Nomavicz, testified that at 5:15 p.m. on the evening of April 9, 1987, Dennis Schorle ran into his

home and told him that he had just shot his wife. Defendant asked Mr. Nomavicz to call the police. Defendant was trembling and crying. Mr. Nomavicz told defendant to stay at his house while his wife called the police and he went to defendant's home. Mr. Novavicz went to the Schorle home, where he saw Mrs. Schorle lying in a pool of blood at the back door. Defendant then appeared, and Mr. Nomavicz told him to go back to his home and wait for the police.

When Detective Hamman searched the Schorle residence, he seized defendant's gun collection. Defendant's gun collection consisted of 14 rifles and 2 pistols. All of the guns were legally registered. The ammunition was kept separate from the guns. Detective Hamman also found defendant's marksmanship awards, and he testified that defendant was an avid shooter.

Detective Hamman took an oral statement from defendant at the police station. Defendant gave a narrative statement without being questioned. Defendant said that he had been having marital problems for more than a year. He stated that on Friday, April 3, 1987, his wife went out to a lounge with her sister and did not return home. Early the next morning his wife called and told him that the battery in the van was dead and that she would be home as soon as it was serviced.

Defendant related the incident concerning the anonymous telephone call that he received on the morning of April 9, when the caller told him to call a phone number that belonged to J.J. He also said that the caller told him that his wife was having an adulterous affair. Defendant next said that he spoke to his wife at work before leaving his job early.

Once defendant arrived home, he called some friends and drank two shots of Southern Comfort whiskey. Then, defendant got a .22 caliber pistol from a cabinet and loaded it. Defendant said that he thought about shooting himself, but he reasoned that that was not the best way to deal with the situation. Mr. and Mrs. Schorle's son, Brian, came home from school and defendant told Brian to leave the house so that he could talk to Delores alone. Defendant then went into the family room and sat down on the sofa. He placed the gun under a seat cushion and waited for his wife. When Mrs. Schorle returned home, she sat down and talked with defendant. When Delores smiled and admitted that she enjoyed being with J.J. on the night of April 3, defendant grabbed the pistol. Delores said "No" and ran. Defendant began firing. The next thing he knew, his wife was lying in the kitchen at the back door. Defendant said that he put the gun to his head, but realized that there were no bullets left. He then knelt down, hugged Delores and apologized to her, and left for help.

After the oral statement, Detective Hamman took a written statement. In the second statement, defendant made one modification. He stated that he lied about receiving an anonymous telephone call that morning. Defendant stated that he asked Delores for the towing slip from the towing service that started her car on the morning of April 4. He called the towing company on the morning of April 9 and obtained the telephone number that Delores had given them. The callback number on the order belonged to J.J. When defendant called the number, he reached an answering machine with J.J.'s voice on it. Defendant said that he considered committing suicide, but he reasoned that it was not the best way to deal with the problem. Defendant also stated that he displayed the gun in order to "scare" his wife. Defendant refused to sign this statement because he believed that his statement regarding suicide would lessen his chances of obtaining bond.

After the State rested, the defense called Patricia Sell, the victim's sister. Ms. Sell testified that she and Delores were close friends as well as sisters. She also stated that she had known defendant for 25 years, and that she knew him to be a good husband who "adored" her sister. She further testified that she was not angry with him for killing her sister.

Defendant called Ms. Sell on the morning of April 4 to ask whether she knew the whereabouts of his wife. Ms. Sell told defendant that Delores left her presence at 10 p.m. the night before, and that she assumed Delores went home.

Ms. Sell testified that defendant called her every day at work to discuss his marital problems. Defendant asked Ms. Sell to be an intermediary between him and his wife but she told him that she loved them both and that she would just listen. On April 9, the day of the shooting, defendant called Ms. Sell at work around 3:30 p.m. He asked her whether Delores was really involved with another man and if he should give Delores a divorce.

Dr. Bruce Christiansen, a clinical psychologist, counseled defendant six times during November and December 1986. Defendant sought counseling because he was depressed and concerned about the stability of his marriage. Defendant told Dr. Christiansen that he had had episodes during which he would beat himself about the head and face. Dr. Christiansen diagnosed defendant as having a masochistic personality disorder.

Dr. Christiansen next saw defendant on December 31, 1987, at the residential treatment facility in the Cook County jail. At the time, defendant was taking "Pamelar," an antidepressant medication. Dr.

Christiansen talked with defendant for three hours. On the basis of this meeting and prior contacts with defendant, Dr. Chistiansen opined that on April 9, defendant was suffering from a "brief reactive psychosis" when he shot his wife and that he did not have the ability to conform his conduct to the requirements of the law.

"Psychosis" is defined as "[a] mental disorder causing gross distortion or disorganization of a person's mental capacity, affective response, and capacity to recognize reality, communicate, and relate to others to the degree of interfering with his capacity to cope with the ordinary demands of everyday life." (Stedman's Medical Dictionary 1166 (5th ed. 1982).) A "brief reactive psychosis" is defined in the record as "the sudden onset of psychotic disorder of at least a few hours, but no more than two weeks duration with eventual return to premorbid level of functioning."

Dr. Christiansen maintained that the brief reactive psychosis happened in response to a stressor. The stressor was finding out that his wife spent the night with J.J. The deteriorating marriage made defendant vulnerable to this stressor.

Dr. Christiansen also testified that a previous episode between defendant and his wife "primed" defendant for this stressor. That stressor was an affair that Mrs. Schorle had had with her hairdresser while defendant was in the Army. This affair happened two or three years after the couple married. During the affair, Mrs. Schorle and her companion incurred large credit card and telephone bills, and they spent defendant's savings. As a result of the affair, Mrs. Schorle became pregnant and left defendant; however, she came back to him. The couple agreed to raise the baby as defendant's son, and defendant promised never to mention the affair. Dr. Christiansen also testified that Mrs. Schorle's indifference toward her husband during and after his recent hospitalization for a herniotomy aided in "priming" defendant for the reactive psychosis.

Defendant was also examined by Dr. Littnar, a psychiatrist. Dr. Littnar was contacted by Dr. Christiansen. Dr. Littnar interviewed defendant for over two hours on February 13, 1988. Dr. Littnar also examined police reports, Dr. Christiansen's reports, and jail reports. He also interviewed Ms. Sell for 55 minutes. Based upon the interviews and the police reports, Dr. Littnar concluded that defendant has long had a personality disorder in the form of a pathological need to please other people. Dr. Littnar also testified that defendant experienced psychotic reactions earlier in his lifetime and on the evening that he killed his wife.

Dr. Littnar opined that defendant's first psychotic reaction oc-

curred 11 years ago when defendant's mother was dying of cancer. At that time, Mrs. Schorle was upset by the fact that defendant took time off to visit his mother. Defendant reacted to his wife's displeasure by beating himself. The stressor to which defendant was sensitive was his wife's displeasure with him.

Dr. Littnar further testified that defendant's personality disorder, coupled with the events on April 9, 1987, became the stressors that triggered a brief reactive psychosis in defendant's mind. Dr. Littnar also stated that the psychosis began when defendant heard J.J.'s voice on the answering machine, and that the psychotic decomposition was completed when Mrs. Schorle walked away from defendant in the living room. Dr. Littnar believed that defendant knew the difference between right and wrong, but defendant's psychotic decomposition prevented him from being able to apply the knowledge and conform his conduct to the requirements of the law.

Dr. Littnar believed that a series of previous problems undermined defendant's ability to manage pressure, making him vulnerable to a brief reactive psychosis. These difficulties included Mrs. Schorle's drinking and her neglect of defendant after his hospitalization, and his sons' academic and drug problems.

■ Dr. Littnar also believed that the shooting was an "isolated explosive disorder." "There are four diagnostic criteria for this disorder: '(A) A single, discrete episode in which failure to resist an impulse led to a single, violent, externally directed act that had a catastrophic impact on others[;] (B) [t]he degree of aggressivity expressed during the episode was grossly out of proportion to any precipitating psychological stressor[;] (C) [b]efore the episode there were no signs of generalized impulsivity of aggressiveness[;] (D) [the behavior is] [n]ot due to Schizophrenia, Antisocial Personality Disorder, or Conduct Disorder.'" *State v. LaTourelle* (Minn. 1984), 343 N.W.2d 277, 281 n.1, quoting The Diagnostic & Statistical Manual of Mental Disorders, at 298 (3d ed. 1989).

In rebuttal, the State called Dr. Albert Stipes, a forensic psychiatrist. Dr. Stipes reviewed the police reports, a social history report, and medical reports. He examined defendant for one hour on September 29, 1987, pursuant to a court order. After interviewing defendant and reviewing the reports, Dr. Stipes concluded that defendant was sane on the night of the shooting, that defendant did not have a mental illness, and that defendant neither suffered a brief reactive psychosis nor an explosive disorder.

Dr. Stipes based his opinion, and so testified, upon several factors, including the following: First, a brief reactive psychosis and an explo-

sive disorder are mutually exclusive mental, illnesses. He explained that an isolated explosive disorder which involves a strong impulse that the person decides to give into, by definition is not a psychosis. Next, defendant's statement that he only intended to "scare" his wife indicated that defendant was not psychotic because he knew what had happened, and a psychotic person would not have known what occurred. Finally, defendant's instant plea to his neighbor to "call the police" shows that defendant was not psychotic, he appreciated the criminality of his conduct, and he knew that it was necessary to call the police. For the aforementioned reasons, Dr. Stipes concluded that defendant was able to appreciate the criminality of his acts and conform his conduct to the requirements of the law.

OPINION

I

First, defendant contends that the trial court erred when it held that the victim's admission that she committed adultery (she smiled and responded "yes" to defendant's question as to whether she enjoyed "it") did not constitute "sufficient provocation" to warrant a finding of voluntary manslaughter. We affirm the trial court's ruling.

■ At the time of the offense in this case, voluntary manslaughter was defined in the Illinois Criminal Code of 1961 as follows:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) ***.

Serious provocation is conduct sufficient to excite intense passion in a reasonable person." Ill. Rev. Stat. 1985, ch. 38, pars. 9—2(a)(1), (a)(2).

See also *People v. McCarthy* (1989), 132 Ill. 2d 331, 340; *People v. Chevalier* (1989), 131 Ill. 2d 66, 71; *People v. Saldivar* (1986), 113 Ill. 2d 256, 265.

"[A] defendant charged with murder may properly be found guilty of the lesser offense of voluntary manslaughter *** only if the evidence establishes the necessary elements of that offense ***." *People v. Chevalier* (1989), 131 Ill. 2d 66, 74.

■ "Sufficient provocation" is one of the necessary elements of the crime of voluntary manslaughter. Illinois courts have held that " '[p]assion on the part of the slayer, no matter how violent will not

relieve him from liability for murder unless it is engendered by a serious *provocation* which the law recognizes as being reasonably *adequate*. If the provocation is *inadequate*, the crime is murder.' " (Emphasis added.) *Chevalier*, 131 Ill. 2d at 73, quoting *People v. Neal* (1983), 112 Ill. App. 3d 964, 969.

◼ The Criminal Code does not enumerate which acts constitute provocation sufficient to reduce the offense of murder to voluntary manslaughter. (*People v. McCarthy* (1989), 132 Ill. 2d 331, 340.) However, Illinois courts have traditionally held that the following four events constitute sufficient provocation: " 'substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and *adultery with the offender's spouse; but not mere words or gestures.*' [Citations.]" (Emphasis added.) *McCarthy*, 132 Ill. 2d at 340-41; *People v. Fausz* (1983), 95 Ill. 2d 535, 539; *People v. Crews* (1967), 38 Ill. 2d 331, 335; *People v. Batson* (1986), 144 Ill. App. 3d 1027, 1034.

◼ The Illinois Supreme Court has mandated that adultery with a defendant's spouse constitutes sufficient provocation to reduce homicide to voluntary manslaughter only where defendant discovers his or her spouse in the act of adultery, or immediately before or after such an act, and defendant kills his or her spouse immediately following the discovery. *People v. Chevalier* (1989), 131 Ill. 2d 66, 72; see also, *People v. Middleswart* (1984), 124 Ill. App. 3d 35, 39; *People v. Harris* (1984), 123 Ill. App. 3d 899, 904; *People v. Wax* (1966), 75 Ill. App. 2d 163, 182.

◼ In the case at bar, defendant did not kill his wife immediately after discovering her in an adulterous act, or immediately prior to or after an act of adultery. The record shows that defendant loaded his gun, waited for his wife, and shot her seconds after she smiled and verbally admitted that she enjoyed the adulterous act. Therefore, Mrs. Schorle's words were not legally sufficient to reduce defendant's homicide to voluntary manslaughter.

Defendant relies upon *People v. Ambro* (1987), 153 Ill. App. 3d 1, *People v. Carr* (1980), 91 Ill. App. 3d 512, and *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, in support of his claim that his wife's confession of adultery constituted sufficient provocation. Defendant's reliance upon these cases is inappropriate. In these cases the courts "recognize[d] an exception to the general rule that a verbal communication of adultery is insufficient provocation." (*People v. Chevalier* (1989), 131 Ill. 2d 66, 72.) A victim's confession of adultery coupled with insulting remarks about a defendant's sexual prowess, *and* a history of marital discord, or a threat by the victim to obtain a divorce constitutes provocation sufficient to reduce the crime of murder to

voluntary manslaughter. See *Ambro*, 153 Ill. App. 3d at 2-7; *Carr*, 91 Ill. App. 3d at 517-18; *Ahlberg*, 13 Ill. App. 3d at 1040-41.

The Illinois Supreme Court explicitly rejected the aforementioned cases in *People v. Chevalier* (1989), 131 Ill. 2d 66. The supreme court found that "the 'exception' to the general rule created by the *Ahlberg* line of cases is an incorrect statement of Illinois law." (*Chevalier*, 131 Ill. 2d at 75-76.) The court held that a verbal communication that adultery has occurred or will occur falls within the rule that mere words are insufficient provocation. (*Chevalier*, 131 Ill. 2d at 75; see also *People v. Middleswart* (1984), 124 Ill. App. 3d 35, 40.) "The rule that mere words are insufficient provocation applies no matter how aggravated, abusive, opprobrious or indecent the language." *Chevalier*, 131 Ill. 2d at 71-72, citing *People v. Neal* (1983), 112 Ill. App. 3d 964, 967.

The Illinois Supreme Court has also found that mere gestures do not constitute sufficient provocation. (*People v. McCarthy* (1989), 132 Ill. 2d 331, 340-41; *People v. Fausz* (1983), 95 Ill. 2d 535, 539; *People v. Crews* (1967), 38 Ill. 2d 331, 335.) Therefore, we also find that the victim's smile did not constitute sufficient provocation.

## II

Defendant next contends that his conviction should be reduced from murder to voluntary manslaughter because the State failed to prove beyond a reasonable doubt that he was not acting under a sudden and intense passion resulting from provocation by his wife.

■ This court has held that it is entirely within the province of the fact finder to determine the credibility of witnesses, the amount of weight to accord their testimony, and the appropriate inferences to be drawn therefrom. (*People v. Scherzer* (1989), 179 Ill. App. 3d 624, 638; see also *People v. Lighthall* (1988), 175 Ill. App. 3d 700, 708; *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 763.) Accordingly, a guilty verdict shall not be disregarded on review unless it is inconclusive, improbable, unconvincing, or contrary to human experience. *People v. Stevenson* (1962), 25 Ill. 2d 361, 365; *People v. Banks* (1985), 138 Ill. App. 3d 994, 1004.

■■ In addition, the People assert that we must limit the scope of our review because judicial review of a trial court's factual finding must be limited to an inquiry of whether a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. The People rely upon *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

We agree with the People. In the seminal case of *Woodby v. Im-*

*migration & Naturalization Service* (1966), 385 U.S. 276, 17 L. Ed. 2d 362, 87 S. Ct. 483, the United States Supreme Court held:

"[I]f the correct burden of proof was imposed at the trial, judicial review is generally limited to ascertaining whether the evidence relied upon by the trier of fact was of sufficient quality and substantiality to support the rationality of the judgment. *** [A]n appellate court in a criminal case ordinarily does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, but whether the judgment is supported by substantial evidence." *Woodby*, 385 U.S. at 282, 17 L. Ed. 2d at 367, 87 S. Ct. at 486.

The Supreme Court followed *Woodby* in *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781. In *Jackson,* the United States Supreme Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original) (*Jackson,* 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789), and that after a defendant has been found guilty, "the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) *Jackson,* 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

In *People v. Collins* (1985), 106 Ill. 2d 237, the Illinois Supreme Court relied upon *Jackson.* The court held that courts reviewing the sufficiency of the evidence should give deference to the fact finder and the prosecution and affirm the trial court's verdict if any reasonable trier of fact could have found the elements of the crime beyond a reasonable doubt. *Collins,* 106 Ill. 2d at 261.

■■ Furthermore, this court recently held that all evidence is to be considered in the light most favorable to the prosecution upon judicial review, and that the relevant question is whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *People v. Hileman* (1989), 185 Ill. App. 3d 510, 515; *People v. Scherzer* (1989), 179 Ill. App. 3d 624, 638; *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 763; *People v. Banks* (1985), 138 Ill. App. 3d 994, 1004.

■■ We affirm the trial court's determination. Defendant maintains the evidence was insufficient to prove beyond a reasonable doubt that he was not acting under an intense passion resulting

from a sudden provocation by his wife. We believe the fact finder could have found the essential elements of murder beyond a reasonable doubt and that evidence that defendant committed the lesser crime of voluntary manslaughter was insufficient.

The record shows defendant knew that his wife committed adultery previously in their marriage. Defendant suspected that his wife had had a recent affair with J.J. on the morning of April 4. His suspicions were confirmed five days later. On the day of the murder, defendant left work early and went home. Once defendant was at home, he found a gun and loaded it. Defendant kept his ammunition in a place separate from his guns. Therefore, loading the gun was a premeditated act. When defendant's son returned home, he asked his son to leave the house so that he could be alone with the victim. Defendant then hid the loaded gun under a cushion on the couch. Defendant testified that he only intended to scare his wife; but, if he only wanted to frighten her, he could have done so with an unloaded gun.

Based upon the record, the jury could have concluded beyond a reasonable doubt that defendant did not experience a sudden intense passion at the time he killed his wife and that he was guilty of murder. Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2).

### III

Finally, defendant contends that the trial court erred when it found defendant failed to meet his burden of proving that he was insane at the time of the shooting. Defendant argues that the trial court weighed the facts and the expert testimony improperly, and that the trial court focused on whether defendant could appreciate the criminality of his conduct, instead of whether defendant could conform his conduct to the requirements of the law. The People maintain that the trial court's ruling was clearly supported by the evidence. We affirm the trial court's decision.

■■ Defendant's contention that the trial court erred by focusing on whether defendant could appreciate the criminality of his conduct is frivolous. A trial court may focus upon whether defendant could have appreciated the nature of his actions. In Illinois, "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct *or* to conform his conduct to the requirements of the law." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).

■■ The law presumes that all defendants are sane. However,

a defendant may overcome this presumption by presenting evidence which raises a reasonable doubt of his sanity. Once a defendant raises the insanity defense, he must prove his insanity at the time of the crime by a preponderance of the evidence. Ill. Rev. Stat. 1985, ch. 38, par. 3—2(b).

 The issue of whether or not a defendant was sane when he committed the crime must be resolved by the fact finder. (*People v. Teague* (1982), 108 Ill. App. 3d 891.) The trier of fact evaluates the credibility of the witnesses, weighs their testimony, and determines the appropriate inferences to be drawn therefrom. (*People v. Scherzer* (1989), 179 Ill. App. 3d 624, 638; see also *People v. Jones* (1982), 109 Ill. App. 3d 120, 126.) The fact finder is not required to accept the opinions or conclusions of experts or psychiatrists. (*Jones,* 109 Ill. App. 3d at 126; *Teague,* 108 Ill. App. at 899.) Ultimately, the "[r]esolution of contrary testimony and [the] determination of its weight and credibility are for the trier of fact." *Teague,* 108 Ill. App. 3d at 899.

A fact finder's verdict on the issue of sanity will not be disturbed unless the "finding is so improbable or unsatisfactory as to raise a reasonable doubt concerning the defendant's sanity" (*Jones,* 109 Ill. App. 3d at 126; see also *People v. Gacy* (1984), 103 Ill. 2d 1, 69), or "it is so manifestly against the weight of the evidence as to indicate the verdict was based [upon] passion or prejudice." *Teague,* 108 Ill. App. 3d at 899; see also *People v. Martin* (1980), 87 Ill. App. 3d 77, 81.

The People introduced the testimony of Dr. Stipes. Dr. Stipes' testimony conflicted with the findings of defendant's expert witnesses, the Drs. Littnar and Christiansen. The fact finder was not obligated to accept the testimony of defendant's expert witnesses. The jury had the authority to evaluate these witnesses, weigh their testimony accordingly, and reach a verdict.

 We will not set aside the trial court's verdict. Upon review of the record, we find that there was sufficient evidence presented at trial to support the finding that defendant was sane beyond a reasonable doubt at the time of the killing. Dr. Stipes testified that defendant did not have a mental illness, and that defendant was able to appreciate the criminality of his conduct and conform his acts to the law. In addition to Dr. Stipes' expert testimony, the record shows that defendant stated that he only wanted to scare his wife, and he asked his neighbor to call the police and report the shooting. These acts show that defendant appreciated the criminality of his conduct and that he was able to conform his acts to the

law. Therefore, we cannot say that the fact finder's conclusion that defendant was sane when he killed his wife was improbable or against the manifest weight of the evidence.

For the foregoing reasons, we affirm the trial court's decision. As part of our judgment, we grant the State's request that defendant be assessed $75 as costs and fees for this appeal, pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, and *People v. Nicholls* (1978), 71 Ill. 2d 166.

Affirmed.

McMORROW, P.J., and LINN, J., concur.