THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK HUGUES, Defendant-Appellant.

First District (2nd Division)   No. 1—89—2152

Opinion filed December 24, 1991.—Rehearing denied June 9, 1992.

Turner & Wolff, of Chicago (Daniel H. Wolff, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Gregory Vaci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McCORMICK delivered the opinion of the court:

Defendant, Mark Hugues, was convicted of armed violence and aggravated battery and sentenced to 20 years' imprisonment on the armed violence charge and seven years' imprisonment on the aggravated battery charge, both sentences to run concurrently. Defendant appeals his convictions, arguing that he was improperly charged with armed violence based on aggravated battery, that he was not proven guilty beyond a reasonable doubt and that the trial court erred in refusing to grant a mistrial after being informed that the jury could not reach a unanimous verdict on all counts. Defendant also argues that his 20-year sentence was an abuse of discretion.

## FACTS

Defendant was charged with attempted murder, armed violence and aggravated battery. At defendant's trial, Frank Vitucci testified that on the evening of February 6, 1987, he was in a bar called Lou & Millie's. The bar was located near the intersection of Fullerton and Mannheim in Melrose Park, Illinois, and was adjacent to Mario's Food Store.

One half hour after Vitucci arrived at the bar, defendant arrived and began talking to Vitucci, although the two had never before met. Vitucci testified that he and the bartender asked defendant where he had parked before entering the bar and warned defendant

that his car would be towed if he had parked on the north side of the driveway.

Vitucci testified that defendant left the bar and returned a few minutes later, saying that his car had been towed. Vitucci described defendant as irate and stated that he was yelling, screaming and hollering. Defendant found out the name of the towing company from the bartender, and Vitucci agreed to drive him there to retrieve his car.

Vitucci stated that defendant was still angry when they arrived at the office of the towing company and that defendant was yelling, screaming, pounding on the walls and threatening to get even. A few minutes later, Vitucci saw defendant come out of the office with David Mumbower, the owner of the towing company. According to Vitucci, defendant got into his car and pulled out of the lot wildly, spraying Vitucci and Mumbower with gravel.

When Vitucci returned to the bar, he saw defendant, who was complaining that his tires had been flattened. Vitucci testified that defendant left the bar to go home and change cars and that when defendant returned he was still angry and threatening to get even with the towing company.

A short time later, Mumbower came into the bar, and defendant began yelling at him, accusing him of having towed his car. Mumbower repeatedly told defendant that he was not the one who had towed the car and that if defendant did not believe him they could go back to the towing company to see the towing receipt. After exchanging more words, the two left the bar and Vitucci followed. Vitucci testified that he watched them walk south on the east side of the street until he lost sight of them. Shortly thereafter, Vitucci heard a gunshot and saw defendant running toward him with a gun in his hand. Vitucci went back into the bar and called the police. When he came back outside, defendant was gone.

David Mumbower testified that he was the owner of S&S Towing (S&S) and that S&S had an agreement with Mario's Food Store to tow any illegally parked vehicles. Mumbower testified that he was at S&S's office on February 6, 1987, when defendant and Frank Vitucci arrived and that defendant was screaming profanities and banging on the window because his car had been towed.

Mumbower testified that after paying for his car, defendant came up to him and said "I'm coming back to get you. I am going to kill you." Defendant than drove off, spraying gravel over Mumbower and Vitucci.

Later that night, Mumbower went to Lou & Millie's for a drink. Mumbower testified that after he was there for a few minutes, he was approached by defendant, who threatened to kill him. Mumbower testified that he tried to ignore defendant, but defendant continued to threaten him and accused him of towing his car and cutting his tires. Mumbower stated that he told defendant that he was not the one who towed his car and he offered to take defendant back to the office to show him the tow tickets.

Mumbower left the bar and began walking south on Mannheim Road with defendant following about a foot behind him. Mumbower testified that when they were a block from the bar, he turned around and saw that defendant had his hands behind his back. Mumbower testified that when he asked defendant what he had behind his back, defendant pulled out a handgun, pointed it at Mumbower's face and stated that he was going to blow Mumbower's head off. Mumbower ducked, turned around and began running. As he ran, he heard the gun go off and felt a bullet strike him in the back. Following the shooting, Mumbower was hospitalized for seven days with cracked ribs and injuries to his diaphragm, spleen and abdomen.

Also testifying for the State was Karen VanderWerff, a forensic scientist with the Illinois State Police. VanderWerff testified that, in her opinion, the gun used in the shooting could not have been fired without pulling the trigger. According to VanderWerff, the gun contained three safety features and all three were functional and operational at the time the gun was tested. VanderWerff also testified that she tested the gun to determine whether it could fire accidentally and that it did not discharge during the tests.

Assistant State's Attorney Roger Kemp testified that he spoke with defendant after his arrest on February 7, 1987, and that defendant gave a statement concerning the shooting. In the statement, which was read to the jury, defendant stated that after discovering that his car had been towed, he went to S&S to retrieve it, and that while he was at S&S, he got into an argument with a towing company employee.

Defendant stated that he returned to the bar, where someone told him that S&S might flatten his tires because he had given them a hard time. After leaving the bar and seeing that one of his tires was flat, defendant went home, got his wife's gun and went back to the bar. Defendant stated that at first, it was his intention to damage the tire of one of the tow trucks but that he later de-

cided to "get back at the driver of the tow truck and not just the company."

Back at the bar, defendant saw the same S&S employee he had seen earlier and this man asked defendant to step outside. Outside, the man began to walk toward an alley, and defendant followed with his hand on his gun. Defendant stated that he suspected that there might be a set up so he removed the gun from his waistband, and the gun went off, striking the man. Defendant told Kemp that "[t]he gun went off before I really wanted to."

Kemp testified that after defendant's statement was transcribed, he showed it to defendant, who looked it over and then signed it.

Ronald Asher, an FBI special agent, arrested defendant on April 20, 1987 in Las Vegas, Nevada, for unlawful flight to avoid prosecution. Asher testified that at the time of the arrest, defendant stated that the charges against him stemmed from a parking incident. Defendant told Asher that he, the victim and a friend of the victim went outside to settle the matter and that, as they were walking, the friend pushed defendant into an alley, while the victim attempted to strike defendant. Defendant stated that he pulled a gun out of his belt, pointed it and it discharged. Defendant stated that he was surprised when the gun discharged and that both he and the victim ran at that point.

Defendant appeared as a witness in his own behalf. Defendant testified that he suffered from hemophilia and that, as a result, he had to be careful to avoid injuries that could cause internal bleeding.

Defendant testified that he arrived at Lou & Millie's between 11 and 11:30 p.m. on February 6, 1987. Shortly after he arrived, he was introduced to Frank Vitucci and they began a discussion of car engines. After a while the two walked outside to look at the engine in defendant's car. It was at that time that defendant discovered that his car had been towed.

Defendant testified that he returned to the bar, telephoned S&S and than drove to S&S with Vitucci. Defendant stated that he was angry when he arrived at S&S and that, while he did swear and hit the counter, he never threatened anyone. Defendant paid the towing fee and then went outside where David Mumbower directed him to his car. Defendant stated that when he pulled out of the lot, he kicked up a lot of dirt and gravel but that he did not do this intentionally.

Defendant and Vitucci returned to the bar, where Vitucci told defendant that Mumbower had threatened to flatten defendant's tires. Mumbower arrived at the bar a few minutes later and a few minutes after that defendant went to his car to get some cigarettes. Defendant testified that when he got outside he decided to go home and that, as he drove away, he noticed that he had two flat tires.

Defendant testified that he became angry and decided to go home, get a gun and shoot out the tires of the tow truck. Defendant testified that when he got home, he checked that the gun was loaded and drove back to the bar.

Defendant testified that when he returned to the bar, he became angry when he noticed Mumbower laughing and pointing at him. Defendant stated that when he went over to Mumbower and asked him about the tires, Mumbower told him to come outside where it was quiet so he could explain things. Defendant followed Mumbower outside and south on Mannheim Road. A few minutes later, defendant heard the door to the bar slam and saw someone else walking in the same direction.

According to defendant, Mumbower walked into an alley, turned in defendant's direction and attempted to strike him. Defendant stated that he reached for his gun and the gun went off. Defendant denied intentionally discharging the gun.

Defendant claimed that when he reached for the gun he believed that Mumbower intended to beat him up and that because of his hemophilia any such beating would have caused great bodily harm. Defendant also stated that he never intended to shoot Mumbower.

On cross-examination, defendant acknowledged that his testimony at trial differed from the statement he signed at the time of his arrest. Defendant claimed that he did not know what was in the statement when he signed it; however, he admitted that he was given the opportunity to read the statement before he signed it.

The jury began deliberations at 12:50 p.m. Two hours later, the jury sent out a note stating:

> "If the jury can agree on a verdict for certain charges but not all the charges, will the defendant be retried on the charge not agreed on, or is the jury considered hung?"

The trial court refused to answer the question but instructed the jury to continue deliberations.

A short time later, the jury sent out a second note stating "we would like to hear part of [defendant's] testimony read to us." The

court responded that the jury was to rely on its collective memory and notes taken during trial.

At 9 p.m., the court stated that it was going to send the jury a note asking if there was any progress in its deliberations and whether it needed any assistance. At this time, defendant made a motion for a mistrial. The court responded that it had an obligation to see if the jury had reached an agreement on anything. The court added that if there was no agreement it would "Prim" the jury.

The jury was brought into the courtroom and asked whether any progress was being made. The jury foreman responded that he believed the jury was at an impasse. The court then gave a further instruction, reciting verbatim the language approved by the supreme court in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.

The jury resumed deliberations and, at approximately 9:57 p.m., indicated that it had reached a verdict. Before the jury returned to the courtroom, defendant renewed his motion for a mistrial, arguing that the verdict would not be the result of the jury's free will, but of coercion. The court denied defendant's motion, and the jury returned verdicts finding defendant guilty of aggravated battery and armed violence and not guilty of attempted murder.

At defendant's sentencing hearing, the State presented evidence that in May 1980 defendant was convicted of burglary and theft and sentenced to one year's probation; that in October 1980, while on probation, defendant was convicted of grand larceny and sentenced to one year in jail; that in February 1982, defendant was convicted of attempted burglary and sentenced to two to four years' imprisonment and that in October 1986, two months before the shooting in the present case, defendant was convicted of aggravated assault with a weapon.

The trial court sentenced defendant to 20 years' imprisonment on the charge of armed violence and seven years' imprisonment on the aggravated battery charge, both sentences to run concurrently. In imposing the sentences, the court noted that defendant's criminal background included a previous weapons offense and that the victim had been shot in the back while attempting to flee.

### Opinion

■ Before addressing the issues raised by defendant in this appeal, we note that the trial court erred in entering judgment and imposing sentences on both the armed violence and the aggravated battery charges. (See *People v. Donaldson* (1982), 91 Ill. 2d 164,

435 N.E.2d 477 (holding that multiple convictions for both armed violence and the underlying felony of aggravated battery cannot stand where a single physical act is the basis for both charges).) Accordingly, we vacate defendant's conviction and sentence for aggravated battery.

# I

■ Defendant's first argument on appeal is that his armed violence conviction cannot stand because it was based on the offense of aggravated battery and amounts to a double enhancement of a misdemeanor in violation of the Illinois Supreme Court's ruling in *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627. Defendant contends that because aggravated battery constitutes a misdemeanor (battery) that has been enhanced to a felony by the use of a weapon, it would be improper to allow the offense to be further enhanced to a Class X felony based on the use of the same weapon.

Defendant's reliance on *Haron* is misplaced. Defendant in the present case is charged with aggravated battery under section 12—4(a) of the Criminal Code of 1961. Section 12—4(a) provides that a person commits aggravated battery when, while committing a battery, he intentionally or knowingly causes great bodily harm.

In *Haron*, the defendant was charged with aggravated battery under section 12—4(b) of the Criminal Code. That section provides that a person commits aggravated battery if he commits a battery using a deadly weapon. The supreme court held in *Haron* that because the defendant was charged with aggravated battery under section 12—4(b), which enhanced the offense of battery to aggravated battery based on the use of a deadly weapon, there would be a double enhancement if the State also was allowed to charge the defendant with armed violence based on a violation of section 12—4(b).

Defendant argues that it is logical to extend the supreme court's holding to aggravated battery charged under section 12—4(a) as well. However, in *Haron*, the supreme court indicated that the armed violence charge would have been allowed to stand if the defendant had been charged with aggravated battery under section 12—4(a). In addition, this court has distinguished armed violence predicated on aggravated battery under section 12—4(a) from armed violence predicated on aggravated battery under section 12—4(b). *People v. Eure* (1986), 140 Ill. App. 3d 387, 488 N.E.2d 1267; *People v. Garcia* (1981), 103 Ill. App. 3d 779, 431 N.E.2d 1234.

In *Garcia*, this court pointed out that aggravated battery under section 12—4(a) is always a felony, regardless of whether the defend-

ant uses a deadly weapon and, therefore, an armed violence charge based on this section would not constitute a double enhancement of the penalty for battery. *Garcia*, 103 Ill. App. 3d at 783.

In *Eure*, we upheld a defendant's conviction for armed violence based on the use of a weapon in an aggravated battery causing great bodily harm. There, we noted that the legislature intended the armed violence statute to act as a strong statutory deterrent to carrying a dangerous or deadly weapon. In ruling that the rationale precluding application of the armed violence statute to the predicate offense of voluntary manslaughter did not apply to a charge of aggravated battery, we stated:

"It cannot be said, therefore, that the use of a weapon in the commission of aggravated battery causing great bodily harm cannot be deterred. The decision to so use a weapon is not one forced on an accused, as in voluntary manslaughter/unreasonable belief in self-defense, nor is it a spontaneous decision, as in voluntary manslaughter/sudden and intense passion. It is an intent offense, unlike involuntary manslaughter. The use of a weapon in such a case can be deterred; the purposes of the armed-violence statute may therefore be achieved by application of that offense to the predicate felony of aggravated battery." *Eure*, 140 Ill. App. 3d at 395.

There is no question that, in the present case, the purposes of the armed violence statute would be achieved by applying it to the predicate felony of aggravated battery. Here, there was evidence that after the initial disagreement with Mumbower, defendant left the bar, went to his home, obtained a gun, changed the ammunition and returned to the bar. Defendant's actions were of the type the armed violence statute was designed to reach, and we find that the deterrent purposes of the statute are satisfied by its application in the case before us.

## II

Defendant next claims that the State failed to prove him guilty beyond a reasonable doubt. Defendant's claim is based on alleged conflicts and contradictions in the testimony of the State's witnesses.

It is well settled that discrepancies in the evidence do not require a finding that the jury's conclusions were so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 52, 538 N.E.2d 453.) The credibility of witnesses, the amount of weight to be accorded their testimony, and the appropriate inferences to be drawn therefrom are within the province of the trier of fact.

The relevant inquiry on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Schorle* (1990), 206 Ill. App. 3d 748, 565 N.E.2d 84.) A reviewing court will not substitute its judgment for that of the jury on questions involving the weight of evidence or credibility of witnesses and will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Young*, 128 Ill. 2d 1, 538 N.E.2d 453.

In the present case, defendant was charged with knowingly and intentionally causing great bodily harm while committing a battery. Defendant contended that the shooting was accidental and the State presented evidence disputing defendant's version of the events. Viewing the evidence in a light most favorable to the prosecution, it cannot be said that no rational trier of fact could have found the elements of aggravated battery beyond a reasonable doubt.

## III

Defendant's next arguments concern the jury's deliberations and the trial court's action in giving the *Prim* instruction. Defendant contends that the trial court should have declared a mistrial when the jury indicated, after nine hours of deliberation, that it was deadlocked.

In *Prim*, the supreme court approved the giving of a supplemental instruction where a jury has reached a deadlock. The court acknowledged the possible coercive dangers inherent in the giving of a supplemental instruction but added that it did not feel that "a jury should be left to grope in such circumstances without some guidance from the court." (*Prim*, 53 Ill. 2d at 74.) The supreme court stated that the time when a supplemental instruction should be given is for the court to decide. *People v. Cowan* (1985), 105 Ill. 2d 324, 473 N.E.2d 1307.

Here, after deliberating nine hours, the jury indicated that it had reached an impasse. The trial court then gave a supplemental instruction using the language approved by the supreme court in *Prim* for instructing deadlocked juries. The jury returned its verdict 50 minutes later.

Defendant argues that the fact that the jury returned its verdict so soon after receiving the *Prim* instruction indicates that the verdict was the result of a compromise. However, in *People v. Dungy* (1984),

122 Ill. App. 3d 314, 461 N.E.2d 485, this court upheld a verdict returned by a jury under similar circumstances.

In *Dungy*, the jury had deliberated 12 hours when it indicated that it was deadlocked. The trial court gave the jury the *Prim* instruction and 40 minutes later the jury returned a verdict. This court affirmed the jury's verdict finding no abuse of discretion in the giving of the *Prim* instruction.

Accordingly, we find no error in the giving of the *Prim* instruction on the facts before us.

## IV

■ Defendant's remaining arguments concern the length of his sentence for armed violence. Defendant argues that his sentence is excessive and should be reduced to the six-year minimum term for armed violence.

This court has repeatedly stated that sentencing determinations are within the discretion of the trial court and that its determination will not be disturbed on review absent an abuse of that discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The trial judge's determination of an appropriate sentence must be given great deference and weight because the trial judge is in the best position to make a sound determination regarding punishment. *People v. Cabrera* (1987), 116 Ill. 2d 474, 508 N.E.2d 708.

In the present case, defendant argues that his 20-year sentence was an abuse of discretion. Defendant points out that the defendants convicted of armed violence in *Eure* and *Garcia* received the minimum term of imprisonment and argues that he should have received a similar term. However, in *Eure* and *Garcia* there is no indication of the defendants' prior criminal history. Here, the record reveals that defendant had several previous convictions, including one involving the use of a weapon. Under these circumstances, we cannot say that the trial court abused its discretion in determining that something more than the minimum term of imprisonment was required.

For the foregoing reasons, we affirm defendant's conviction and sentence for armed violence, and we vacate defendant's conviction and sentence for aggravated battery.

Affirmed in part; vacated in part.

SCARIANO, P.J., and DiVITO, J., concur.