THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANK C. ALERTE, JR., Defendant-Appellant.

First District (3rd Division)  No. 1—90—2003

Opinion filed January 22, 1992.—Rehearing denied February 19, 1993.

Randolph N. Stone, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Rebecca Davidson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial in 1980, defendant, Frank C. Alerte, Jr., was convicted of murder and sentenced to 30 years' imprisonment in the Illinois Department of Corrections. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1.) Defendant's conviction was affirmed on appeal. After defendant exhausted his State court remedies, he petitioned the United States District Court for a writ of *habeas corpus*. The district court granted a writ, but stayed its execution for 120 days in order to allow the State to retry defendant. The United States Court of Appeals affirmed the district court's order. Defendant received a bench trial in 1990. Defendant was convicted of murder again and sentenced to 25 years' incarceration.

The following issues are before this court for review: (1) whether the trial court erred when it denied defendant's motion to dismiss; and (2) whether defendant was proven guilty beyond a reasonable doubt. We affirm.

On January 12, 1980, defendant stabbed Paul Kelly to death. Kelly was a student at DePaul University in Chicago, Illinois. Kelly lived in a dormitory named Corcoran Hall. Defendant was coach of the DePaul tennis team of which the victim was a member.

On the evening of January 12, defendant visited Kelly at Corcoran Hall. The two men were observed playing ping-pong there at approximately 6 p.m. Shortly thereafter, they left the dormitory.

At approximately 7 p.m., Sharon Smith, who was looking through a window in the lobby of Corcoran Hall, observed two men running across the yard towards the dormitory. Smith's view of the men was obstructed when they moved closer to the door. Several seconds later, she heard the sound of a key scraping against the lock on the door. Smith remained in the lobby for a few minutes and then went to her room.

Jeff Arnier saw two men standing close together in the doorway of Corcoran Hall around 7 p.m. Arnier noticed that the taller of the two men had his back to the wall of the dormitory, and the shorter man was facing him. Arnier heard grunting noises as he walked by the men.

Carol Stusaitis was also in the yard outside of Corcoran Hall around 7 p.m. Stusaitis noticed that the shorter man was supporting the taller man, who was slouched against the wall of the building. As she approached Corcoran Hall, she observed that the taller man tried to move closer to the dormitory door but defendant moved with him in order to "block him" so that Stusaitis "couldn't see him." Stusaitis asked defendant what was going on, and defendant told her that the taller man was intoxicated and that he would be fine. As Stusaitis turned to walk into the building, she saw defendant's left arm move backward, and she observed a shiny object in his hand. She saw the taller man clasp his hand to his throat, and she observed that his neck was red. Stusaitis then put her key in the door and asked the men again if they wanted to come inside. The shorter man said no. Stusaitis then entered the building. Stusaitis later identified defendant as the shorter man whom she saw near the dormitory that evening.

Dan Lyons approached Corcoran Hall shortly after Stusaitis went inside. Lyons observed defendant holding Kelly by the back of his jacket. Lyons noticed that defendant was wearing light-colored pants and a dark blue coat. Lyons saw the shorter man pull Kelly toward the bushes. When Lyons reached the doorway of Corcoran Hall, he asked defendant what was going on. Defendant told Lyons that Kelly was "just drunk," that he would "get over it," and that he would "be alright." Lyons bent down next to Kelly and noticed that Kelly's neck was cut. Lyons told defendant that the victim appeared to be bleeding. Lyons then entered Corcoran Hall and telephoned the authorities. While

making the call, he saw David Sinkus and asked Sinkus to bring the victim inside because of the cold weather.

Sinkus, who knew both Kelly and defendant, ran outside and observed Kelly lying in the bushes, and defendant standing nearby. When Sinkus asked defendant to help him carry the victim inside, defendant declined to assist Sinkus and told him not to move the victim. Sinkus described defendant as being calm. Sinkus then went inside to tell the resident advisor what had occurred. When Sinkus went back outside several minutes later, defendant was gone.

Ivanhoe Hall observed defendant leave the crime scene. As Hall approached defendant, he saw defendant push a knife into his pocket.

Detectives Lee Epplen and Lawrence Flood were assigned to investigate Kelly's death. After speaking to several people in Corcoran Hall, the detectives obtained defendant's address from the resident advisor. Detectives Flood and Epplen then drove to 8018 South Peoria in Chicago, Illinois, where they were admitted by defendant. They asked defendant to accompany them to the police station. Detective Epplen went upstairs with defendant to allow him to change his clothes. Detective Epplen also asked defendant to bring the clothing that he was wearing earlier in the day. Defendant gave Epplen his blue top coat and told him that he was wearing the same pants. Defendant also pointed to a grey sweater. At that time Detective Epplen noticed reddish-brown stains on the sweater, and he took the sweater. The detectives then placed defendant under arrest and drove him to the Chicago Police Area 6 station.

During the drive, defendant was advised of his *Miranda* rights. Defendant thereafter admitted that he had been with the victim that day at Corcoran Hall until 7 p.m.

The detectives and defendant arrived at the police station around 11 p.m. At that time, defendant was again advised of his *Miranda* rights. Defendant then gave Detective Flood a detailed account of his activities that day. Defendant told Detective Flood that he and Kelly were walking towards the train station, when Kelly stated that he had forgotten something. Defendant maintained that Kelly then walked back to Corcoran Hall in order to obtain what he had forgotten. Defendant claimed to have waited 15 minutes before he went to look for Kelly, whom he found leaning against the door. Defendant stated that he then attempted to lift Kelly up. Defendant admitted to Detective Flood that he told a man that Kelly was drunk, and he stated that although he did not see any blood on the victim, other people told him that Kelly was bleeding. In this initial conversation, defendant denied ever speaking to a woman,

and he claimed that he left the scene because the victim was in good hands.

Defendant was then interviewed by Assistant State's Attorney Howard Regenbogen between 12:30 and 1 a.m. on the morning of January 13, 1980. Defendant told Regenbogen that he saw Kelly leaning against the door of the dormitory and that the victim's coat was zipped up to his neck. Defendant admitted to Regenbogen that he told both a man and a woman that Kelly was intoxicated.

Later that morning, Detective Flood spoke to defendant again. During this interview, defendant admitted that he had seen and spoken to a woman, and that he assured her that Kelly was drunk and that he would take care of Kelly. At that time, Detective Flood noticed a cut on the back of defendant's right thumb and a second cut on defendant's right index finger.

At defendant's first trial, Dr. Euphil Choi testified that he conducted an autopsy on the victim's body. Dr. Choi stated that the victim was stabbed 26 times leaving wounds in his torso, legs, and neck. Dr. Choi told the court that the victim's death was caused by multiple stab wounds which penetrated his heart and lungs. Dr. Choi also testified that the toxicology test conducted on the victim revealed that the victim had not consumed alcohol. In addition, Arnier, Hall, Lyons, Sinkus, Smith, and Stusaitis all testified on behalf of the State. Defendant was found guilty of murder and his conviction was affirmed on appeal. See *People v. Alerte* (1983), 120 Ill. App. 3d 962, 458 N.E.2d 1106.

Defendant then petitioned the United States District Court for the Northern District of Illinois for a writ of *habeas corpus*. Defendant alleged that he was denied due process of law because the State's summation to the jury was inaccurate. On August 30, 1989, the district court granted the writ but stayed its execution for 120 days in order to allow the State to retry defendant. (See *United States of America ex rel. Alerte v. Lane* (N.D. Ill. 1989), 725 F. Supp. 936.) This order was docketed on September 1, 1989. On September 9, 1989, the Attorney General of Illinois (Attorney General) appealed to the United States Court of Appeals for the Seventh Circuit. In addition, the Attorney General moved to alter or amend the judgment issuing the writ on September 12, 1989. (Fed. R. Civ. P. 59(e).) On October 23, 1989, the district court denied the State's motion to alter or amend. The order dated October 23, 1989, was docketed on November 13, 1989. In December of 1989, the Attorney General made an emergency motion for stay pending an appeal before the Seventh Circuit. This motion was granted on December 29, 1989. On March 13, 1990, the Seventh Circuit affirmed the district court's stay of the writ. (See *Alerte v. McGinnis* (7th Cir. 1990),

898 F.2d 69.) Defendant then made a motion to dismiss in the circuit court of Cook County on March 15, 1990, on the basis that the State violated section 103—5(a) of the Code of Criminal Procedure of 1963 (Speedy Trial Act) (Ill. Rev. Stat. 1989, ch. 38, par. 103—5(a)). The trial court denied defendant's motion. Defendant was tried again for murder in 1990.

At defendant's second trial, the testimony of most of the witnesses at the first trial was entered into the record by way of stipulation that the testimony of those witnesses, if called again, would be substantially the same as it was when they testified against defendant in 1980. In addition, Mary Ann Caporusso, chief serologist for the Chicago police department, testified on behalf of the State. Caporusso was the only witness to testify in court at defendant's second trial.

Caporusso testified that she examined several samples of the victim's blood, the victim's clothing, and defendant's clothing. First, Caporusso tested a sample of the victim's blood obtained during the autopsy. Caporusso determined that the victim had type O blood. She also found that the clothing the victim was wearing when he was killed was saturated with type O blood. Caporusso classified the blood on defendant's clothing as type B. She also found that there was a negligible amount of type A blood on defendant's sweater and jacket. Caporusso also observed an "H reaction" when she tested one of the stains on defendant's jacket. An "H reaction" indicates the presence of type O blood. Caporusso concluded that the blood found on defendant's clothing was type B. During cross-examination, Caporusso explained that her finding of type B blood was not inconsistent with defendant's actual blood type AB. At the close of all the evidence, defendant was convicted of murder again and sentenced to 25 years' imprisonment in the Illinois Department of Corrections.

On appeal, defendant first contends that the trial court erred when it denied his motion to dismiss because the State violated section 103—5(a) of the Speedy Trial Act (Ill. Rev. Stat. 1989, ch. 38, par. 103—5(a)) when it failed to commence his trial within 120 days after the district court ordered a retrial. Defendant argues that his second trial began 195 days after the district court's order. Defendant contends that the 120-day term commenced when the district court's grant of *habeas corpus* was docketed on September 1, 1989, and that it ran therefrom until the Seventh Circuit Court of Appeals ruled to stay the writ on March 13, 1990.

The State maintains that defendant was properly granted a new trial when the State courts regained jurisdiction over defendant after a

final judgment was issued by the Seventh Circuit affirming the district court's denial of the State's motion to alter and amend. We agree.

■ The People have correctly noted that there is no precedent which defines exactly when the 120-day term begins to run where a defendant is brought from the Federal court system back into the State judicial system. The Speedy Trial Act provides that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody." (Ill. Rev. Stat. 1989, ch. 38, par. 103—5(a).) When a defendant prevails in an Illinois court of review, a mandate issues which, when properly docketed, commences the running of the 120-day term. (*People v. Worley* (1970), 45 Ill. 2d 96, 98, 256 N.E.2d 751, 752.) However, Supreme Court Rule 604(a)(4) provides that "[t]he time during which an appeal by the State is pending is not counted for the purpose of determining whether an accused is entitled to discharge under section 103—5 of the Code of Criminal Procedure." 134 Ill. 2d R. 604(a)(4); see *People v. O'Malley* (1982), 108 Ill. App. 3d 823, 827, 439 N.E.2d 998, 1000.

■ Accordingly, we find in the present case that the time during which the State's appeal was pending in Federal court may not be counted for purposes of section 103—5(a) of the Speedy Trial Act. The State is not obligated to commence a retrial in State court until all relevant matters pending in Federal court are disposed of. To rule to the contrary places both the Illinois courts and the prosecution in the untenable position of having to commence retrials while appeals are pending in the Federal courts which may render the retrials unnecessary or moot. In the present case, a mandate issued which commenced the running of the 120-day term on September 2, 1989, the day after the writ was docketed. (Ill. Rev. Stat. 1989, ch. 1, par. 1012.) The term was suspended on September 9, 1989, when the Attorney General filed a notice of appeal in the Seventh Circuit. As of November 9, 1989, 69 days had expired on the term. On November 13, 1989, the notice of appeal was invalidated by the docketing of the district court's order denying the Attorney General's motion to alter and amend. (Fed. R. App. P. 4(a)(4).) The appeal was in effect during the four-day period from the time the notice of appeal was filed until the day the order denying the motion to alter and amend was docketed. On December 29, 1989, the Seventh Circuit granted the State's emergency motion for stay pending appeal and ordered that the appeal should be expedited. The grant of this motion validated the Attorney General's original notice of appeal filed on November 9, 1989, and suspended the term as of December 29, 1989. Forty-six more days expired on the term between November 14, 1989, and December 29, 1989. December 29, 1989, was the 115th day of the

term. The term began to run again on March 13, 1990. Defendant's second trial commenced on March 15, 1990. Therefore, 118 days in custody are attributable to defendant for purposes of the Speedy Trial Act. Accordingly, we rule that the trial court did not err when it denied defendant's motion to dismiss.

Next, defendant alleges that the State failed to meet its burden of proving him guilty of murder beyond a reasonable doubt because the State's case was based solely on circumstantial evidence. The State maintains that defendant was proven guilty beyond a reasonable doubt because the evidence, viewed in its entirety, proved that defendant stabbed Kelly 26 times causing his death. We agree.

The relevant inquiry on review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Trimble* (1991), 220 Ill. App. 3d 338, 350; *People v. Schorle* (1990), 206 Ill. App. 3d 748, 759, 565 N.E.2d 84, 91.) The reasonable doubt standard must be applied when reviewing the sufficiency of the evidence in a criminal case even where the defendant's conviction was based solely upon circumstantial evidence. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346.) Once a defendant has been found guilty, a reviewing court must consider all of the evidence in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Trimble*, 220 Ill. App. 3d at 350; *Schorle*, 206 Ill. App. 3d at 759, 565 N.E.2d at 91.

■ Upon viewing the evidence in the light most favorable to the prosecution, we find that the trial court could have found the essential elements of murder and concluded that defendant was guilty of murder beyond a reasonable doubt. Several witnesses testified that defendant was with the victim immediately before, during and after the stabbing. Smith testified that she saw defendant chase the victim across the yard towards Corcoran Hall. Stusaitis stated that she saw defendant and the victim together outside of the door to Corcoran Hall and she observed that the victim was slouched against the wall of the dormitory. Stusaitis also told the court that she saw defendant's left arm move backward, and she observed a shiny object in his hand. Stusaitis' testimony was corroborated by Lyons, Sinkus, and Hall. Hall testified that he observed defendant put a knife in his pocket as he left the scene of the crime. In addition, Caporusso testified that defendant's and Kelly's blood types match the blood types found on their clothing.

A guilty verdict will not be reversed by a court of review unless it is " 'inconclusive, improbable, unconvincing, or contrary to human experience.' " (*People v. Trimble* (1991), 220 Ill. App. 3d 338, 350, quoting *People v. Schorle* (1990), 206 Ill. App. 3d 749, 758, 565 N.E.2d 84, 90.) The trial court's finding in the present case is neither inconclusive, improbable, unconvincing nor contrary to human experience.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

GREIMAN, P.J., and CERDA, J., concur.